IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 9, 2003

## STATE OF TENNESSEE V. ARTHUR BUFORD, III

**Direct Appeal from the Criminal Court for Shelby County
No. 01-04246-47    W. Otis Higgs, Jr., Judge**

No. W2002-02258-CCA-R3-CD - Filed March 1, 2004

The appellant, Arthur Buford III, was convicted by a jury of two counts of first degree murder. After being sentenced to two consecutive life sentences, the appellant presents the following issues for our review: (1) whether the trial court abused its discretion by allowing the introduction of photographic evidence of the crime scene; (2) whether the evidence is sufficient to sustain the convictions; and (3) whether the trial court properly sentenced the appellant. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Ross A. Sampson, Memphis, Tennessee, for the appellant, Arthur Burford, III.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; William L. Gibbons, District Attorney General; Jerry Kitchen and Betsy Carnesale, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Factual Background

The appellant worked at a car wash in Memphis with both Cedric Moerings and Tyler Jones. The appellant's lifelong friend, Omarr Hurd, worked at a local hotel. On January 8, 2000, Omarr Hurd reserved a room at the hotel for the appellant's mother for the night. The appellant's sister and her boyfriend, Justin McNeil, came to the hotel at some point to "hang out" with the appellant's mother and watch television.

When Omarr Hurd got off work that night at around 11:00 p.m., his girlfriend picked him up and took him home. He changed clothes before the appellant picked him up in his mother's car. The appellant's mother called and asked him to pick up his sister and her boyfriend at the hotel and take them home. The appellant and Omarr Hurd picked up the appellant's sister and Justin McNeil at the hotel. Instead of taking them home, however, the appellant stopped at Cedric Moerings's and Tyler Jones's apartment. On the way to the apartment, the appellant asked if anyone had any gloves. The appellant pulled the car around to the back of the apartment, backed into a parking space, and produced a gun. Omarr Hurd had given the gun to the appellant on New Year's Eve to return to Cedric Moerings. Omarr Hurd had borrowed the gun from Cedric Moerings several months earlier after someone attempted to rob his girlfriend. Omarr Hurd asked the appellant to return the gun to Cedric Moerings because, about a week and a half prior to January 8, 2000, Omarr Hurd and Cedric Moerings got into an argument about a young woman named Brandy. Evidently, Omarr Hurd gave Brandy his phone number even though Cedric Moerings was trying to date her. Cedric Moerings told Brandy several things about Omarr Hurd that were not true, and, when confronted about what he told Brandy, Cedric Moerings and Omarr Hurd got into a verbal altercation.

When the appellant produced the gun, he turned around to his sister and Justin McNeil in the backseat of the vehicle, cocked the gun, and said in a joking manner, "If y'all tell anybody I came over here, I will kill y'all." The appellant left the car. Omarr Hurd, the appellant's sister, and Justin McNeil sat in the car for five to ten minutes listening to the radio. Then the appellant returned to the car and was shaking so badly that he could hardly start the car. He placed the gun in Omarr Hurd's lap and stated, "You need to get that away from me." Omarr Hurd then asked how Cedric Moerings was doing, but the appellant did not respond. He later commented that "I was the last thing [Tyler Jones] saw before I shot him." The appellant drove the car to his mother's house where everyone went inside.

The appellant then took Omarr Hurd home. Once there, Omarr Hurd gave the appellant a box of bullets and told him to "get those out of my house . . . I don't have anything to do with this." The appellant took the bullets, put them in the garbage and took the garbage out to the dumpster. The appellant then left Omarr Hurd's house for about twenty-five minutes. When the appellant returned, he stayed with Omarr Hurd until the two were arrested by the police on January 11, 2000.

During the afternoon of January 9, 2000, Officer Ashley Moore of the Memphis Police Department visited the apartment of Cedric Moerings and Tyler Jones at 5444 Meadowlake Drive in Memphis in response to an anonymous telephone call. After arriving at the apartment, Officer Moore knocked on the door but received no response. He also knocked on a window and received no response. At that time, Officer Moore peered through the window, saw the television was on, and could see that someone was lying on the couch. Because the screen was not on the window, Officer Moore raised the window and peered inside the apartment. He saw two individuals inside, realized that something was wrong, closed the window, and called for an ambulance.

Once the paramedics arrived, they entered the apartment through the window with Officer Moore where they discovered the two victims. One victim was lying on the couch with a large injury

to the head.  The other victim was sitting in a recliner, wrapped in a comforter, with a large injury to the head.  Both victims appeared to be dead.  Officer Moore performed a quick search of the apartment to secure the area before climbing back out of the window.  The victims were later identified as Cedric Moerings and Tyler Jones.

When the appellant was arrested on January 11, 2000, he gave several different versions of the events of the evening of January 8, 2000, to the police.  Only after being confronted with the other witnesses' versions of what happened that night did the defendant ultimately admit to the shootings.  The appellant's statement indicates that he drove to Cedric Moerings's and Tyler Jones's apartment and exited the vehicle while his sister, Omarr Hurd, and Justin McNeil waited in the vehicle.  According to the appellant, Omarr Hurd did not give him the gun to return to Cedric Moerings until that night.

The appellant indicated that once he arrived at the apartment and knocked on the door, Cedric Moerings answered the door.  The appellant asked Cedric Moerings if he knew where he could get some "weed," Cedric Moerings replied, "No," and then went to the bathroom.  When Cedric Moerings returned from the bathroom, the appellant gave him the gun.  The appellant stated that at that time, Cedric Moerings took the gun, pointed it at him, and started verbally assaulting him.  The appellant testified that he was scared that Cedric Moerings was going to kill him, so he reached for the gun.  The two started tussling and the appellant managed to twist the gun out of Cedric Moerings's hand and shoot the gun several times.  The appellant claimed he shut his eyes when he shot the gun, and that he shot Cedric Moerings near the front door of the apartment.  The appellant stated that, at that time, Tyler Jones jumped up from the couch and rushed toward him.  The appellant again closed his eyes and fired the gun several times.  After the appellant shot Cedric Moerings and Tyler Jones, he ran back to the vehicle.

The appellant was indicted by the Shelby County Grand Jury on two counts of first degree murder for the deaths of Cedric Moerings and Tyler Jones.

Dr. O'Brien C. Smith, a forensic pathologist and Medical Examiner for Shelby County, performed the autopsies on both victims and testified at trial.  He determined that Tyler Jones, the victim found lying on the couch, was shot at close range, within two feet, twice in the center of his forehead.  The two gunshot wounds were three-fourths of an inch apart.  Dr. Smith was able to determine the range of the shots due to the presence of powder burns on Tyler Jones's forehead.  One bullet entered the center of his forehead, went through the scalp, bone, sinuses, and became lodged in the roof of his mouth where the bullet was recovered.  The second bullet struck the upper forehead, went through the scalp and skull, producing skull fractures and damage to the right frontal lobe of the brain.  The second bullet was recovered in Tyler Jones's skull.  Dr. Smith opined that the cause of Tyler Jones's death was multiple gunshot wounds to the head.

Cedric Moerings, the victim found in the recliner chair, was also shot twice in the head.  The gunshot wounds were located on the right side of his head above the ear and were eighty-five hundredths of an inch apart.  Both shots were from a distance of more than two feet and both bullets

traveled to the back of Cedric Moerings's skull on the left side where the bullets were recovered. Both of the victims were killed with a .38 caliber automatic gun.

Paulette Sutton, Assistant Director of Forensic Science at the Regional Forensic Center, is an expert blood serologist who has analyzed body fluids and blood stain patterns for twenty-five years. At trial, she testified that when a body is shot, blood is expelled from the body instantaneously, before the body is able to fall or move. She was able to determine from photographs, diagrams of the crime scene, autopsy files, statements, and other information, that Tyler Jones, who was found on the couch, was found in essentially the same position as when he was shot. Her opinion was based on the fact that there were no blood stains on the pillows around the body, on the sofa, or on Tyler Jones's pants or socks. There was also not any blood on the floor or the nearby coffee table. Ms. Sutton concluded that it was impossible for Tyler Jones to be in an upright position or even sitting up on the couch when he was shot.

As to Cedric Moerings, who was found sitting in a recliner chair with a comforter wrapped around him, Ms. Sutton similarly concluded that he was also found in the same position as when he was shot and killed. Ms. Sutton based her conclusion on the fact that there were no blood stains on the comforter wrapped around Moerings, on the front of his shirt, or the floor beneath him. Cedric Moerings's blood was confined to the right side of his head.

Ms. Sutton ultimately concluded that it would have been impossible for either victim to be in a standing, sitting, attempting to sit, attempting to stand, or any position other than the position they were in when found.

At the conclusion of the evidence, the jury convicted the defendant of two counts of first degree murder. As a result, he was sentenced to two consecutive life sentences. On appeal, he challenges the sufficiency of the evidence, the introduction into evidence of certain crime scene photographs, and the imposition of two consecutive life sentences.

<u>Introduction of Crime Scene Photographs</u>

The appellant complains on appeal that the trial court abused its discretion by admitting crime scene photographs. Specifically, the appellant contends that the trial court should have granted his motion in limine to exclude certain photographs as unduly prejudicial and cumulative. He argues that the photographs showing "one of the men's brains coming out of his nose" as well as the "photographs showing the location of the bullet wounds" were cumulative, prejudicial, and unnecessary to rebut the appellant's theory of self-defense or show premeditation on his part. The State counters that the appellant has waived this issue on appeal for failing to identify which photographs should have been excluded. The State points out that the appellant's brief, motion for new trial, and amended motion for new trial do not identify which photographs should have been

excluded.[1]  In the alternative, the State argues that the crime scene photographs were not unduly prejudicial or overly cumulative.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. See, e.g., Banks, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; see also Banks, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and their prejudicial effect is outweighed by their probity. Banks, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951 (citing Milam v. Commonwealth, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is one entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. Id. at 949; State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In the case herein, the trial judge conducted a jury-out hearing on the motion in limine filed by the appellant prior to opening statements and prior to the admission of the contested photographs. Upon reviewing the photographs, the trial court weighed the prejudicial effect of the introduction of the photographs with the probative value and made a determination that the photographs were admissible.

---

[1] The motion in limine itself is not a part of the record. There is a brief exchange at the beginning of trial where the appellant's counsel states that "all of them [the photographs] are just way too prejudicial to show the jury." Later on in the discussion, the appellant's counsel and the trial court make references to "this one right here" and "this." The trial court decided to address the admissibility of each photograph prior to its admission. During trial, when several unspecified photographs were about to be introduced, appellant's counsel objected. The trial court conducted a side bar where the court admitted certain photographs and refused others. The trial court stated that it was "going to allow these but not those." Thus, from the record, we are unable to ascertain in particular which photographs the appellant is challenging on appeal. "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Ordinarily, the failure of the appellant to secure an adequate record precludes our consideration of matters not contained in the record. See Tenn. R. App. P. 24(b); State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). Nevertheless, due to the severity of these offenses, we will address the appellant's issue on the merits.

The record contains photographs of the victims lying on the couch and recliner as well as the autopsy photographs which all graphically demonstrate the location and nature of the victims' wounds. The photographs were used at trial during testimony of the police officer who was the first on the scene, the medical examiner who performed the autopsies, and the blood serologist. The police officer testified as to the nature of the scene upon his arrival, including the location of the bodies and the nature of the wounds that the victims sustained. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994) (stating that trial court did not abuse its discretion when it admitted a photograph of a corpse to illustrate the testimony of a police detective). The Medical Examiner utilized autopsy photographs to illustrate the location and nature of the wounds sustained by the victims. See State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993) (holding that trial court did not abuse its discretion in allowing autopsy photograph of victim during guilt phase of trial in part to illustrate Medical Examiner's testimony). The blood serologist utilized the photographs from the scene and from the autopsy to make conclusions regarding the location of the victims at the time they were shot. Her testimony was introduced to rebut the appellant's theory of self-defense.

We determine that the pictures were certainly relevant to counter the appellant's contention that he shot the victims in self-defense with his eyes closed after a "tussle" for the gun. The pictures indicate a violent attack where each of the victims was shot twice in the head. They show the close proximity of the gunshot wounds as well as the location of the victims' bodies. We have viewed the photographs and conclude that while they were certainly unpleasant, the probative value of the photographs was not substantially outweighed by danger of unfair prejudice. Under these circumstances we cannot say the trial judge abused his discretion in admitting these pictures. This issue does not merit reversal.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the case herein, the appellant was charged with two counts of first degree murder and the jury returned a verdict finding the appellant guilty on both counts. The appellant argues on appeal that the evidence presented at trial did not establish that he acted with premeditation. Further, the appellant argues that the testimony of Omarr Hurd and Justin McNeil was contradictory as to the events that transpired the night of the killings and that his own testimony was consistent with his theory of self-defense. The State counters that there was overwhelming evidence to support the verdict.

Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder, in pertinent part as "a premeditated and intentional killing of another." Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann.§ 39-13-202(d). Therefore, in order to convict the appellant of his indicted offense, the State was required to prove beyond a reasonable doubt that the defendant killed the victims with "premeditation." "[W]hether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the" commission of the crime. State v. Billy Gene Debow, Sr., No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *4 (Tenn. Crim. App. at Nashville, Aug. 2, 2000); see also State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. Davidson, 121 S.W.3d at 614; Bland, 958 S.W.2d at 660; see also State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992).

Looking at the evidence in a light most favorable to the State, the evidence at trial showed the following. The appellant admitted that he killed both Cedric Moerings and Tyler Jones. The testimony of Ms. Sutton, the blood serologist, indicated unequivocally that it was impossible for either victim to have been in a standing or even a sitting position at the time they were shot due to the lack of blood anywhere except for the immediate area of the gunshot wounds. Omarr Hurd testified that the appellant admitted to shooting the victims while they sat in the recliner and lay on the couch.

The only question at trial was whether there was premeditation or whether the appellant killed the victims in self-defense as he proclaimed. Self-defense requires a reasonable belief that "force is immediately necessary to protect against the other's use or attempted use of unlawful force" and that there was an "imminent danger of death or serious bodily injury" to the defendant. Tenn. Code Ann. § 39-11-611(a). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It was within the jury's purview to reject the self-defense theory. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). We conclude that there was sufficient evidence for the jury to find the appellant guilty of two counts of first degree murder. This issue has no merit.

<u>Sentencing</u>

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

The appellant argues on appeal that the trial court erred by ordering consecutive sentencing. Specifically, he argues that the record is "absent of the specific statutory factors used to determine if consecutive sentencing is warranted." The State counters that because there is no record of the

sentencing hearing in the record, this Court must presume that the sentence imposed by the trial court is correct.[2]

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn.Code Ann. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. See State v. Imfeld, 70 S.W.3d 698, 708-09 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 938-39 (Tenn. 1995).

In imposing the consecutive sentences, the trial court described the crimes as "gruesome . . . the scene of . . . two bloody, dastardly, homicides" and the manner in which the homicides occurred as "almost like a professional killing. Two professional killings." The trial court noted that the appellant maintained several different versions of the events of the night of the murder throughout the investigation and trial, and that the appellant even tried to change his story on the day of the sentencing hearing. The trial court found that it would be "manifestly unjust . . . to the community if I did not run these sentences consecutively. . . it must be a deterrent to the Memphis community that when you take two lives in this manner, you're going to have to step up to the plate and pay for it." The court then ordered the two life sentences to be served consecutively.

The trial court did not expressly label the appellant a "dangerous offender" or expressly address the two Wilkerson factors. See Wilkerson, 905 S.W.2d at 939. Nevertheless, it is apparent from the trial court's findings that it felt consecutive sentencing was necessary to protect the public from further criminal conduct by the appellant, the second Wilkerson factor. Id. Further, while it was not expressly addressed by the trial court that consecutive sentences were reasonably related to the severity of the offenses, the first Wilkerson factor, the trial court did find that the heinousness of the crimes "crie[d] out" for consecutive sentencing. Id. Under these circumstances, we find that the imposition of consecutive sentencing was appropriate in this case.

---

[2]We note that the original technical record filed in this Court did not contain a transcript of the sentencing hearing. On August 15, 2003, the appellant filed a motion to supplement the appellate record. This Court entered an order on August 20, 2003, ordering the trial court clerk to certify and transmit a supplemental record within fifteen days. The trial court filed a letter with this Court on September 8, 2003, stating that "the appellant did not submit to the trial court clerk a transcript of the motion for new trial. . . [t]herefore the trial court clerk is unable to certify and transmit a supplemental record as requested by [appellant's counsel]." Despite this letter, the trial court submitted two volumes of supplemental record on September 23, 2003, which consisted of the transcripts of the opening and closing statements. Then, on September 26, 2003, a transcript of the sentencing hearing was filed with this Court. The transcript of the sentencing hearing contains a certification by the clerk of the trial court that it represents a true and accurate copy of the transcript. The State did not file an additional brief once the transcript of the sentencing hearing was filed with this Court.

Conclusion

After a thorough review of the record, we find that none of the issues raised by the appellant merit relief, and thus, affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE