# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 4, 2008 Session

## STATE OF TENNESSEE v. STARBROUGH JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-01013    Chris Craft, Judge**

---

**No. W2006-02230-CCA-R3-CD  - Filed September 25, 2008**

---

A Shelby County Criminal Court jury convicted the appellant, Starbrough Jones, of first degree felony murder, especially aggravated robbery, and attempted especially aggravated robbery, and the appellant received sentences of life, twenty-one years, and nine years, respectively. The trial court ordered that the appellant serve the twenty-one-year and nine-year sentences concurrently with each other but consecutively to the life sentence. On appeal, the appellant contends that (1) the trial court erred by allowing unreliable hearsay testimony into evidence in violation of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004); (2) the evidence is insufficient to support the convictions; and (3) consecutive sentencing is excessive. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

David Christensen (on appeal) and Robert Parris (at trial), Memphis, Tennessee, for the appellant, Starbrough Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Parks and Greg Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that the appellant and Cadaro Hughes were jointly indicted for first degree felony murder and attempted especially aggravated robbery of Anthony Woodfork and especially

aggravated robbery of Ricardo Guevara. At the appellant's trial, Deborah Ann Thompson testified that Anthony Woodfork was her younger brother and that he was killed in May 2004. On the day of her brother's death, a cousin telephoned Thompson and told her that Woodfork had been shot in the back. Thompson and her family went to the hospital, and doctors told her what had happened to her brother. She said Woodfork had been working at S&S Tire on the day of the shooting and was twenty-six years old.

Ricardo Guevara testified through an interpreter that his brother, Salvadore Guevara, owned S&S Tire at 3125 Summer Avenue in Memphis. On May 14, 2004, Ricardo[1] was working there with Anthony Woodfork. The appellant and two other men arrived at the shop in a red car. The appellant approached Ricardo and asked for "the black guy." Woodfork overheard the appellant first and came outside to speak with him. The appellant and Woodfork talked for five minutes about the appellant selling Woodfork some tennis shoes. The appellant and the two other men then left in the red car. About 7:00 p.m., the men returned to the shop. The appellant got out of the red car and had tennis shoes in his hands. He gave Ricardo a pair, and Ricardo sat in the passenger seat of Woodfork's car to try on the shoes. Ricardo was sitting in the car with the passenger door closed and the window rolled down. Woodfork was sitting in the driver's seat, and the appellant was standing beside Woodfork. A second man, who had arrived at the shop with the appellant, was standing by Ricardo.

Ricardo testified that he bent down and began trying on the shoes. Woodfork had money in his mouth, and began arguing with the appellant over the money. When Ricardo sat upright, he saw that the second man had pointed a gun at Ricardo's head. The man opened the car door, and Ricardo got out with his hands up. The appellant was screaming, and Woodfork got out of the car and began struggling with the appellant. The appellant and Woodfork moved out of Ricardo's sight, and the man pointing the gun at Ricardo reached into Ricardo's pocket and took his wallet. Ricardo heard a gunshot, and then the man pointing the gun at him shot him. He stated that he spent two days in the hospital and that the bullet was still in his body.

On cross-examination, Ricardo testified that Woodfork's shooter had a dark complexion and short, curly hair. He acknowledged that he recognized the appellant as the man who shot Woodfork. He also acknowledged giving a statement to police but said he did not remember saying in the statement that the shooter had a medium complexion. Within a month of the shooting, he looked at a photographic array but was unable to identify a suspect. He stated that eight to ten days later, he was shown a second array and identified the appellant. He acknowledged that Woodfork was his friend and that he wanted justice for Woodfork's death.

Hector Guevara, Ricardo Guevara's brother, testified through an interpreter that he was working at S&S Tire on May 14, 2004. Hector was in the shop's office, heard two gunshots, and

---

[1]Because some of the witnesses in this case share a surname, we have chosen to utilize their first names for clarity. We mean no disrespect to these individuals.

went outside. He saw Anthony Woodfork lying on the ground and went to talk with him but realized he was dead. Hector ran to hug his brother, and Ricardo told Hector he had been shot. Hector stated that earlier in the day, three men had driven to the shop in a red car. Hector did not see who shot Woodfork or Ricardo, but he stated that the appellant was one of the men who came to the shop earlier that day. He said that the police showed him a photographic array and that he identified someone in the array as having participated in the crimes. On cross-examination, Hector acknowledged that he was unable to make a positive identification from the photographs.

Dr. Feng Li, the Assistant Medical Examiner for Shelby County, testified that he performed Anthony Woodfork's autopsy on May 15, 2004. Woodfork was seventy-one inches tall and weighed one hundred seventy-one and one-half pounds. He had a gunshot wound in the left side of his back, in the right side of his back, and in his right elbow. Dr. Li did not see any marks, such as stippling, around the wounds and concluded that the gun was more than three feet away from Woodfork when it was fired. The bullet that entered the left side of Woodfork's back damaged Woodfork's left lung, liver, right lung, and left kidney, and Dr. Li recovered the bullet from Woodfork's chest blade. The bullet that entered the right side of Woodfork's back damaged his right lung, liver, and pancreas, and Dr. Li recovered the bullet from Woodfork's abdominal wall. Woodfork lost a large amount of blood, and both of the wounds were potentially fatal. The bullet that struck Woodfork's elbow was a superficial perforating wound that traveled through the elbow, and Dr. Li was unable to recover it. He stated that Woodfork's cause of death was multiple gunshot wounds.

Seventeen-year-old Marco Deshaun Rubin testified that he knew the appellant as "Teddy" and that he had known the appellant and the appellant's brothers for a couple of years. One day in June 2004, Rubin was at a house on Given Street with a group of people, including the appellant and Cadaro Hughes. Rubin stated that Hughes told him that on the day of the shootings, a man was supposed to buy shoes from Hughes. Cartrell Taylor drove Hughes, the appellant, and a man known as "Bright Teddy" to S&S Tire in a red car. Taylor and "Bright Teddy" waited in the car while Hughes "ran up to [the] Mexican . . . and the other dude ran and [the appellant] shot him." Hughes told Rubin that he was "tussling with the Mexican" and shot him and that the appellant shot "[t]he black guy." Hughes told Rubin that they robbed "[t]he black guy" and took two hundred to three hundred dollars from him. Rubin acknowledged that he talked with the police about the crimes and told them that the appellant's brother, Alfreddie, was involved. However, Rubin testified at trial that Alfreddie was not involved and that the police mistakenly wrote down that information.

On cross-examination, Rubin testified again that he told the police Cartrell Taylor drove the red car to S&S Tire. When asked by the defense if he told the police that "Bright Teddy" was the driver, Rubin said, "They took [it] down wrong." He said he had known the appellant for about two years and acknowledged that he told the police he had known the appellant about eight years. He acknowledged that he did not use the appellant's real name in his statement to police but said he did not know the appellant's real name at that time. He said he did not remember telling the police that a man named Damien Howard planned the robbery, and he denied telling the police that Howard sold shoes. He said that he told the police he did not remember what kind of car was used in the robbery and that he did not know anything about the car when he gave his statement. He said some of the

answers in his statement to the police were wrong.

Officer Darrel Felton of the Memphis Police Department testified that about 8:30 p.m. on May 14, 2004, he got a call of a "man down" and went to S&S Tire. He was the first officer to arrive at the scene and saw an African-American male lying on his right side. The male blinked his eyes a couple of times but could not talk. Blood was on the ground, and the male was not wearing any shoes. Officer Felton also saw a Hispanic male sitting in a pickup truck.

Officer Marlon Wright of the Memphis Police Department testified that about 8:50 p.m. on May 14, 2004, he was dispatched to S&S Tire to preserve the crime scene. The victims had already been removed from the area. He stated that photographs taken of the crime scene showed one blue and white tennis shoe inside Anthony Woodfork's vehicle on the driver's side. A shoe-shaper and a cellular telephone were on the floorboard on the driver's side. Outside the car, one hundred seventy dollars was on the ground beside the driver's door. A second blue and white tennis shoe and a brown tennis shoe were also on the ground.

On cross-examination, Officer Wright testified that when he arrived at the tire shop, light rain was falling, but "it soon after started pouring down rain." He said that two cellular telephones were found at the scene, one outside the victim's car and one on the car's driver's side floorboard. He said that the parking lot was poorly lighted and that officers had to use the high beams from their patrol cars to see the area.

Officer Carl Craig of the Memphis Police Department testified that on June 3, 2004, he had a second job working as a security guard for an apartment complex. About 1:30 a.m., Officer Craig was inside his security office and heard a gunshot. He went outside and saw a man, later identified as the appellant, standing between two apartment buildings. Officer Craig was wearing his police uniform and called out to the appellant. However, the appellant "scooted" around the corner of the building, and Officer Craig and his partner ran after him. The appellant ran upstairs to the building's second floor and down a corridor. Officer Craig saw a gun in the appellant's hand and intended to arrest him for possession of a weapon. The appellant ran to the end of the corridor, jumped up onto the railing, and jumped fifteen to twenty feet down to the ground. The appellant was injured and could not get up, and Officer Craig handcuffed him and asked for his name. At first, the appellant would not give Officer Craig any information. However, some people at the scene told Officer Craig that the appellant's name was "Teddy," and the appellant finally told Officer Craig his name was Starbrough Jones. Officer Craig called an on-duty officer to the scene, and Officer John Harper arrived and collected the appellant's gun, which was a six-shot .38 caliber revolver that contained four live rounds and one spent cartridge. Officer Craig charged the appellant with unlawful possession of a weapon and evading arrest.

Memphis Police Department Officer John Harper, III, testified that about 1:30 a.m. on June 3, 2004, he was called to an apartment complex at 2925 Mimosa. When he arrived, he saw the appellant lying on the ground and screaming. When Officer Craig and his partner rolled the appellant over, Officer Harper saw a gun underneath the appellant. Officer Harper took possession

of the gun, which was a loaded, blue steel .38 caliber gun, and had the appellant transported to The Med. On cross-examination, Officer Harper testified that the appellant was screaming in pain and did not threaten or point the gun at him.

Special Agent Robert Daniel Royse from the Tennessee Bureau of Investigation (TBI) testified as a firearms identification expert that the TBI received the .38 caliber revolver recovered from the appellant, the four live rounds found in the gun, the one spent cartridge case in the gun, and the two bullets recovered from Anthony Woodfork's body. Agent Royse test-fired the gun and concluded that the spent cartridge case had been fired in the revolver. He stated that two of the four live rounds from the gun contained bullets that were consistent with having been manufactured by the same manufacturer as the bullets recovered from Woodfork's body. He also stated that the features of the two bullets recovered from Woodfork were consistent with two of the live rounds found in the gun. Agent Royse determined that both of the bullets recovered from Woodfork's body were made by the same manufacturer but that only the bullet recovered from Woodfork's chest had been fired from the revolver. The bullet recovered from Woodfork's abdomen was fired from a different gun.

Sergeant William D. Merritt of the Memphis Police Department testified that he was the case officer for the crimes committed at S&S Tire on May 14. Sergeant Merritt went to the scene and spoke with other officers. The police determined that the money and both of the cellular telephones found at the scene belonged to Anthony Woodfork. The tennis shoes found at the scene were tested for fingerprints, but no prints were recovered. On June 3, 2004, Sergeant Merritt met with Marco Rubin, and Rubin told Sergeant Merritt what he knew about the shooting. From that information, Sergeant Merritt collected photographs of suspects and showed them to Rubin. Rubin identified Cadaro Hughes' photograph. Rubin also identified one of the photographs as that of Alfreddie Warr. Sergeant Merritt later learned that Alfreddie Warr's real name was Starbrough Jones and that Aldreddie Warr was the name of Jones' brother.

Sergeant Merritt testified that he put together some photographic arrays and showed them to Hector and Ricardo Guevara with the help of a translator. He showed Ricardo a photographic spread that contained Cadaro Hughes' photograph and a spread that contained the appellant's photograph, but Ricardo was unable to identify anyone. Sergeant Merritt showed Hector a photographic spread containing Cadaro Hughes' photograph, but Hector was unable to identify a suspect. When Sergeant Merritt showed Hector a photographic array containing the appellant's photograph, Hector identified someone as a participant in the crimes. However, Hector was not one hundred percent positive and, therefore, signed a form stating that he could not make a positive identification. On June 3 or 4, Sergeant Merritt learned that the appellant had been arrested for unlawful possession of a weapon and evading arrest but that he had already made bond and been released from custody. Sergeant Merritt obtained the appellant's arrest ticket to find out the type of weapon the appellant had possessed. Sergeant Merritt also obtained the bullets recovered from Woodfork's body and sent them and the appellant's gun to the TBI for testing. He later learned that one of the bullets recovered from Woodfork had been fired from the appellant's gun.

Sergeant Merritt testified that on June 18, 2004, he spoke with the appellant about Woodfork's death. The appellant told Sergeant Merritt that he had been arrested on a drug charge, which Sergeant Merritt knew was untrue. Sergeant Merritt showed the appellant a photographic array containing Marco Rubin's photograph, but the appellant indicated he did not know Rubin.

On cross-examination, Sergeant Merritt testified that when he spoke with Marco Rubin on June 3, 2004, Rubin said he had known Alfreddie Warr about eight years. Rubin told Sergeant Merritt that men told him "Bright Teddy" drove the getaway car but that the men did not give Rubin a description of the car. Rubin also said that the men told him Damien Howard planned the robbery at S&S Tire and that Rubin knew Howard to sell Nike tennis shoes in the neighborhood. Sergeant Merritt acknowledged that Rubin answered several questions as "Alfreddie Warr." Sergeant Merritt sent one of the tennis shoes recovered from the crime scene to the TBI for testing, and DNA inside the shoe belonged to Cartrell Taylor. When Sergeant Merritt questioned the appellant, the appellant denied knowing anything about Anthony Woodfork's death.

On redirect examination, Sergeant Merritt testified that Marco Rubin told him Alfreddie Warr participated in the robbery and shooting at S&S Tire. Sergeant Merritt then showed Rubin some photographs, and Rubin said the man he was talking about was actually Starbrough Jones. Rubin did not tell Sergeant Merritt that Cartrell Taylor had been involved in the robbery.

Sergeant Merritt also was called to testify for the defense. He said that he showed the Guevara brothers a photographic array containing the appellant's photograph and that Ricardo was unable to make an identification. Hector identified someone other than the appellant. However, Hector was not positive about the identification.

TBI Special Agent Qadriyyah Debnam testified that she performed DNA analysis on evidence in this case. She analyzed skin cells found in a blue and white pair of tennis shoes and compared them to Cartrell Taylor's saliva. DNA from skin cells in the right shoe matched the DNA in Taylor's saliva. However, Agent Debnam was unable to obtain enough DNA from the left shoe to make a comparison. On cross-examination, Agent Debnam testified that rain could affect the ability to collect DNA from evidence.

Eddie Warr, the appellant's brother, testified that Brandy and Alfreddie Warr were also his brothers. He said that the appellant bought a handgun in June 2004 and that the appellant bought the handgun two or three days before the appellant was arrested at the apartment complex. The appellant bought the gun from "Mario, something like that." The defense showed the witness a photographic array containing Marco Rubin's photograph, and the witness identified Rubin as "Mario." On cross-examination, Eddie Warr acknowledged that the appellant went by the name "Teddy," but he did not know if the appellant had used the name "Alfreddie" previously. Eddie Warr acknowledged that he did not tell anyone about the appellant's buying the gun from "Mario" until the Monday before the appellant's trial.

The jury convicted the appellant of first degree felony murder and attempted especially

aggravated robbery of Anthony Woodfork and especially aggravated robbery of Ricardo Guevara. The trial court immediately imposed a life sentence for the appellant's first degree murder conviction and scheduled a sentencing hearing for his remaining convictions.

## II. Analysis

### A. Right to Confrontation

The appellant contends that the trial court committed plain error by allowing Marco Rubin to give inadmissible hearsay testimony in violation of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). Specifically, he contends that Rubin's testimony regarding what Cadaro Hughes told him about the robbery and shooting at S&S Tire was so "crippling" that the issue could not have been waived for tactical reasons and that consideration of the issue is necessary for a just disposition of the case. The State first contends that plain error relief is not warranted because the appellant participated in Hughes' conversation with Rubin and, therefore, the record does not show that an unequivocal rule of law was breached or that a substantial right was adversely affected. The State also contends that the appellant is not entitled to plain error relief because the appellant has failed to show that his attorney did not object for tactical reasons. We agree with the State that the appellant has failed to show his attorney did not object for tactical reasons.

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him" and article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face." In Crawford, the Supreme Court examined the right to confrontation. The Court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 127 S. Ct. at 1374. Recently, our supreme court explained that a statement is testimonial "if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions." State v. Kacy Dewayne Cannon, ___ S.W.3d ___, No. E2005-01237-SC-R11-CD, 2008 Tenn. LEXIS 278, *34 (Knoxville, Apr. 29, 2008). Statements to friends and acquaintances, however, are nontestimonial. See Crawford, 541 U.S. at 51, 124 S. Ct. at 1364 (providing that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). "If the statement is nontestimonial, the Confrontation Clause does not apply, and the statement must be analyzed under the "traditional limitations upon hearsay evidence." Cannon, at **34-35. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802.

Marco Rubin stated that sometime in June 2004, he was at a home in Memphis with a large group of people, including the appellant and Cadaro Hughes. He then testified as follows:

Q       How did this conversation come up about the robbery?

A       I was gambling and Cadaro told me about it.

Q       Who did?

A       Cadaro telling me, you know, he was worried he had told me what had happened.

Q       So Cadaro telling you about this robbery, what does he say about the robbery?

A       He told me that day he said a guy supposed to bought some shoes from him and he's supposed to met the guy at his shop, and the guy -- when they got there I guess . . . he said the guy he ran up to [was] Mexican and the Mexican was tussling and he said the other dude ran and Mr. Jones shot him.

. . . .

Q       And what did Starbrough say he did?

A       He never did get to say what he did. He was like Cadaro told me he was tussling and Starbrough shot the other guy.

The appellant contends that Rubin's statements about what Cadaro Hughes told him were nontestimonial. We agree. Therefore, the Confrontation Clause does not apply. Nevertheless, the statements were hearsay, and they fail to meet the requirements of any exception to the hearsay rule. However, the appellant did not object to Rubin's hearsay testimony. Tennessee Rule of Appellate Procedure 36(a) does not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."

Although the appellant has waived the issue, he contends that this court should address his claim as plain error. Tennessee Rule of Criminal Procedure 52(b) provides that this court may, "[w]hen necessary to do substantial justice," address "an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). When determining whether an error constitutes plain error, the following factors should be considered:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). The presence of all five factors must be established, and consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. Furthermore, the error "'must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

We agree with the State that the appellant has failed to show that defense counsel did not waive this issue for tactical reasons. The defense cross-examined Rubin extensively, pointing out numerous discrepancies between what Hughes allegedly told Rubin and what Rubin told police. For example, Rubin testified during direct examination that Hughes told him Cartrell Taylor drove the getaway car, that the getaway car was red, and that the appellant shot and robbed Anthony Woodfork. But under cross-examination, the jury heard that Rubin told police "Bright Teddy" drove the getaway car, that Rubin did not know anything about the getaway car, and that Alfreddie Warr shot and robbed the victim. The jury also heard that Rubin told the police Damien Howard planned the robbery and that Rubin never mentioned the appellant's name in his statement to police. We also note that during a jury-out hearing before the first witness testified, defense counsel informed the trial court that Cartrell Taylor had not been charged with any crimes related to this case and that "there's more evidence to link Cartrell Taylor to this murder than there is the defendant." Counsel then stated that "depending on what I'm able to get into with Mr. Rubin, three shooters with two guns, it doesn't make any sense. . . . [S]omebody's lying." The appellant has failed to show that he did not waive this issue for tactical reasons.

### B. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions because no one saw him shoot Anthony Woodfork or even saw him with a gun. He argues that although the jury heard testimony that he was arrested with the murder weapon, Eddie Warr testified that the appellant purchased the gun two weeks after the crimes at S&S Tire were committed. Finally, he contends that the discrepancies in Marco Rubin's testimony and his statement to police cast doubt on Rubin's credibility and the appellant's conviction. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to

the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

Ricardo Guevara testified that the appellant came to the S&S Tire shop on May 14, 2004, where he and Anthony Woodfork were working. The appellant spoke with Woodfork about buying some tennis shoes and left. He and some men returned to the shop that evening. The appellant and a second man gave tennis shoes to Woodfork and Guevara, and the victims began trying on the shoes in Woodfork's car. The second man pulled a gun on Guevara and took his wallet, and Woodfork and the appellant began arguing over money. The appellant and Woodfork tussled and moved out of Guevara's sight. Guevara heard someone shoot Woodfork, and then the second man shot Guevara. Two weeks later, Officer Craig arrested the appellant and found him in possession of the murder weapon. At trial, Guevara identified the appellant as the man who argued and struggled with Woodfork over money on May 14. Marco Rubin testified that Cadaro Hughes told him the appellant shot Woodfork. As noted by the appellant, parts of Rubin's testimony were inconsistent with the statement he gave to police. However, even if the jury totally discredited Rubin, the jury reasonably could have determined from Guevara's testimony alone that the appellant committed the first degree felony murder and attempted especially aggravated robbery of Woodfork and the especially aggravated robbery of Guevara. The evidence is sufficient to support the convictions.

## C. Excessive Sentence

The appellant contends that the trial court erred by ordering consecutive sentencing because the court determined he was a dangerous offender based upon his prior criminal record, not upon the circumstances of the instant crimes. He also contends that because the trial court had already sentenced the appellant to life for the first degree murder conviction when it ordered consecutive sentencing, consecutive sentencing was not necessary to protect the public from the appellant. The State contends that the trial court properly ordered consecutive sentencing. We agree with the State.

At the appellant's sentencing hearing, no witnesses testified, but the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-two-year-old appellant was expelled from school in the ninth grade for truancy and fighting and has two young children. The report shows that the appellant worked as a busboy for nine months at El Chico Restaurant in 2000. The appellant did not report any alcohol or drug use and stated in the report that

he was in good physical and mental health. The report shows that since he was eighteen years old, the appellant has been convicted of misdemeanor theft, aggravated criminal trespass, simple assault, and two weapons offenses. The report also shows that the appellant was adjudicated delinquent for attempted aggravated robbery, unlawful possession of a weapon, and evading arrest in 2000.

The trial court applied enhancement factor (2), that the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," based upon the appellant's five prior misdemeanor convictions, and factor (21), that the appellant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. 40-35-114(2), (21) (2003). The court enhanced the appellant's sentence one year above the presumptive midpoint of the range for the especially aggravated robbery conviction, a Class A felony, and sentenced him to twenty-one years to be served at one hundred percent. See Tenn. Code Ann. § 40-35-112(a)(1), -210(c), (d) (2003), -510(i)(2)(E). For the attempted especially aggravated robbery conviction, a Class B felony, the court enhanced the appellant's sentence one year above the presumptive minimum of the range and sentenced the appellant as a Range I, standard offender to nine years. See Tenn. Code Ann. § 40-35-112(a)(2), -210(c), (d) (2003). Regarding consecutive sentencing, the trial court stated as follows:

> In light of Mr. Jones' record of weapons and attempted robberies and his actions in this case I do find that he's a dangerous offender. I'm going to run the criminal attempt . . . especially aggravated robbery and the especially aggravated robbery concurrent with each other but consecutive to the life sentence.

Tennessee Code Annotated section 40-35-115(b)(4) provides for consecutive sentencing if "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In order to support consecutive sentencing based upon a defendant's being a dangerous offender, a court must find that (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) "the terms are reasonably related to the severity of the offenses." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The appellant argues that the trial court determined he was a dangerous offender based upon his prior criminal record, not upon the circumstances of the instant crimes. However, at the conclusion of the sentencing hearing, the trial court stated that it was ordering consecutive sentencing based upon the appellant's "actions in this case." Furthermore, in a written order dated the same day as the appellant's sentencing hearing, the trial court stated that it found the circumstances surrounding the offenses to be aggravated, and it specifically addressed the

"Wilkerson factors."[2]  We agree with the trial court that the facts in this case justify consecutive sentencing.  The appellant met with the victims at their workplace under the guise of selling them tennis shoes.  He then argued with the unarmed Woodfork over money and shot him while an accomplice robbed and shot Ricardo Guevara, who also was unarmed.  The appellant is a dangerous offender.  As to his claim that consecutive sentencing is not necessary to protect the public because he received a life-sentence for the murder conviction, this court has stated that "[t]he power of a trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments."  State v. Robinson, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1995) (affirming trial court's ordering defendant to serve two sentences of life without parole consecutively).  Therefore, the  trial court properly ordered consecutive sentencing.

## III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[2]The trial court informed the parties about the written order during the appellant's motion for new trial hearing.