**STATE of Tennessee, Appellee,**

v.

**John R. ROBINSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Dec. 13, 1995.

Permission to Appeal Denied by Supreme Court June 3, 1996.

Guy T. Wilkinson, District Public Defender, Richard DeBerry, Asst. Dist. Public Defender, Savannah, for appellant.

Charles W. Burson, Attorney General & Reporter, Michael J. Fahey, II, Assistant Attorney General, Nashville, Robert "Gus" Radford, District Attorney General, Jerry Wallace, John Overton, Asst. Dist. Attorneys General, Decaturville, for appellee.

## OPINION

SUMMERS, Judge.

A jury found appellant, John Robinson, guilty of two counts of first degree murder and arson. He received two sentences of life without parole and a two year sentence all running consecutively. Appellant's brief raises seven issues challenging: (1) the sufficiency of evidence, (2) the admission of his wife's testimony, (3) the admission of crime scene photographs, (4) the instructions to the jury as to the range of punishment for a lesser included offense, (5) the jury's finding of aggravating factors, and (6) the trial court's sentencing. We affirm.

### FACTS

This case involves a double homicide occurring on the morning of October 16, 1993. The victims were Janice and Timmy Barnett. Pursuant to a plea agreement, appellant's wife and codefendant (Kimberly Robinson) testified for the state. At trial she stated that on the evening of October 15, 1993, appellant was high on "crank" after ingesting the drug on numerous occasions. Later that evening, the appellant left their apartment to go to a local bar. Upon returning home, he stated that he had seen the victims, and "he was tired of their [sic],—tired of them yelling at him about the bad checks,—and that he was going to take care of them."

Mrs. Robinson's testimony indicates that the appellant was "frantic" after talking to the victims. She testified that "[h]e said he was going to kill them" and that he insisted that she take him to their residence "right then." The wife complied by getting a babysitter for their child and driving appellant to the victims' neighborhood. She testified that appellant had her drop him off two houses down from the victims' house. He then instructed her to return home and "that he would call [her] when he got ready for [her] to pick him up."

Mrs. Robinson testified that around four o'clock in the morning on Saturday, October 16, 1993, appellant arrived back at their apartment. She stated that she, Shelly Adams (the baby-sitter), and Tommy Alexander were all present when appellant returned. At trial, they all testified that appellant was "real pale," sweating, dirty, and "freaked out." Tommy Alexander testified that appellant appeared to have either blood or a scratch on his face. Mrs. Robinson stated that appellant made everyone leave except her. She testified that the following

exchange took place after everyone else had left:

> I asked him why didn't he call me, and he said the phone was disconnected,—and I asked him what happened, —and he just looked at me, and he said,—"they are dead",—and I said,—"who is dead"? And he said, "Janice and Timmy".[1]

Mrs. Robinson testified that they drove to a factory where appellant had left the victims' car. The appellant got into the Barnetts' car and followed her to a deserted area. Upon arrival, the appellant got out of the victims' car and removed items from the trunk. The items appeared to be the victims' billfolds and some clothes. Before leaving, appellant set the victims' car on fire.

Later that morning, the appellant and his wife drove to Memphis. On the way to Memphis, the appellant explained to Mrs. Robinson in graphic detail how he had murdered the victims. She related that appellant went to the Barnett's house and Janice let him in. Appellant told Janice that he and his wife had been fighting and that he needed a ride to his car. Janice went in and told her husband Timmy, who had been sleeping, that she was going to take appellant to his car. Mrs. Robinson further testified:

> [h]e said they went down to a road,—and he said that Janice was raising hell about the checks,—about me,—about everything,—and he said that he needed to use the bathroom,—and he got out,—and when he got back in, . . . he hit her with a gun. [He then] duct-taped her and put her in the trunk. . . . He said he went in [to the victims' house], and started walking around;—and then stopped and thought,— "what am I doing?" And he said he was going back to let Janice out of the trunk,— to talk her into not telling on him for what had just happened, –that he was going to let her out,—and she had kicked her way through the trunk,—and took off running to the next door neighbor's house,—and she was screaming that she was going [to] send him to jail.

He said he went to the porch and tried to calm her down,—and get her to listen to him,—and she wouldn't,—she just kept screaming and fighting him, . . . He said he pulled the gun out, and tried to shoot it,—and it wouldn't shoot, . . . and she took off running,—and he tackled her,—and she picked up a brick and tried to hit him with it,—and he took it away from her, and started shaking her,—and he hit her in the head with it, —and he heard her neck pop,—and she didn't move.

Mrs. Robinson testified that appellant said he went back to kill Timmy because "he knew that Timmy knew that [appellant and Janice] left together,—and he had to kill Timmy,—so that Timmy wouldn't tell that him and Janice left together." Appellant found a blade in a pig bucket, went into Timmy's bedroom where Timmy was asleep, and began hitting him with the bladed instrument. After killing Timmy, he went back to see whether Janice was dead. He then cut her throat "to make sure she was dead."

Mrs. Robinson and the appellant later returned to the victims' vehicle. The vehicle had not completely burned so appellant, using lighter fluid, ignited the car for a second time.[2] He then retrieved the VCR and telephone answering machine he had hidden beside a tree close to the victims' car.

Mrs. Robinson's testimony indicates that she and the appellant had dinner that night at Tracy Beecham's home. Appellant gave Mr. Beecham both the VCR and the answering machine to satisfy a debt. Upon discovering that appellant had been arrested for the murders, Mr. Beecham threw both the VCR and the answering machine into a river. The answering machine was later recovered and identified as the victims' property.

Janice Mitchell testified that about 7:15 a.m. Monday, October 18, 1993, Mrs. Robinson told her that appellant had killed the victims. Mrs. Mitchell stated that the wife went into detail when conveying appellant's story to her about the killings. This conver-

---

1. Evidence at trial was proffered that the victims' telephone service had been disconnected for unpaid telephone bills.

2. This testimony is corroborated by Johnny Hays of the Fire Marshal's Office who found that the vehicle had been burned twice.

sation occurred around two hours prior to the discovery of the first body, Timmy Barnett. Timmy Barnett's dead body was discovered in his bed at about 9:00 a.m. that Monday.

The authorities were unable to locate Janice Barnett on October 18th. On Tuesday, October 19th, Janice Mitchell's husband contacted the authorities. He informed the police that Mrs. Robinson told his wife that appellant killed Janice Barnett behind a trailer close to the crime scene. Thereafter, the TBI went to that location and discovered Janice Barnett's partially decomposed body.

## I

▮ Appellant challenges the sufficiency of the evidence. He argues that because he alleged, two to three weeks after his arrest, that someone else "committed the murders and there was a grossly insufficient investigation" into his allegation, any conflict in testimony should not be resolved, on appeal, in the state's favor. He buttresses his argument by stating that the condition of the victims' baby could not be reconciled with the evidence proffered.[3] We disagree.

▮ Great weight is accorded jury verdicts in criminal trials. Jury verdicts accredit state's witness and resolve all evidentiary conflicts in the state's favor. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983); *State v. Banes,* 874 S.W.2d 73, 78 (Tenn. Crim.App.1993). On appeal, the state is entitled to both the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn.1978). Moreover, guilty verdicts remove the presumption of innocence, enjoyed by defendants at trial, and replace it with a presumption of guilt. *State v. Grace,* 493 S.W.2d 474 (Tenn.1973). Appellants, therefore, carry the burden of overcoming a presumption of guilt when appealing jury convictions. *Id.*

▮ When appellants challenge the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); Tenn.R.App.P. 13(e). The weight and credibility of a witness' testimony are matters entrusted exclusively to the jury as the triers of fact. *State v. Sheffield,* 676 S.W.2d 542 (Tenn.1984); *Byrge v. State,* 575 S.W.2d 292 (Tenn.Crim.App.1978).

Appellant's arguments lack merit. Appellant's mere allegation implicating another suspect several weeks after his arrest is unsubstantiated. The suspect proffered an alibi which the appellant unsuccessfully challenged. Similarly, we find the proof or lack of proof concerning the infant's condition does not undermine the jury's verdict.

Appellant conveyed to his wife a detailed description of the murders. This description contained intimate information from which the jury could have reasonably concluded that only the murderer would possess. This intimate information was also conveyed to Janice Mitchell prior to the discovery of the crime and ultimately assisted the authorities in locating Janice Barnett's missing body.

We further find that Mrs. Robinson's testimony was corroborated by the evidence presented at trial. The types and locations of the injuries appellant claimed to have inflicted were consistent with those found upon the deceased victims' bodies. Timmy Barnett's wounds were also consistent with the curved blade appellant claimed to have used in killing Timmy Barnett. Testimony showed that a "bush hook," a large curved blade consistent with the weapon appellant described using, was missing from the back of a van parked in front of the victim's house. The jury also heard testimony that appellant indicated to an inmate that he had burned the

---

3. The victims' baby remained at their residence in its crib following the murders. Appellant contends that the baby, after 48 hours, should have had dry defecation on her and should have been on the verge of starvation. The jury heard evidence that the child immediately consumed two bottles of milk upon being discovered. The jury, however, did not hear evidence pertaining to the child's examination at the hospital nor did the record indicate whether any indications of urination or bowel movements were found in the child's crib.

bloody clothes he wore while committing the murders and discarded the murder weapon in a gully where "nobody would ever find it."

The proof supports a jury finding of first degree murder. The jury could have reasonably inferred, from the evidence, that appellant carried his gun to the victims' residence with the intent to kill. Testimony revealed that appellant stated that "he was going to kill them" and that they "deserved to die,— that they owed him money." The jury heard testimony that appellant said he tried to shoot Janice Barnett but his derringer misfired. This was corroborated by proof that the appellant's gun was subject to misfiring. Furthermore, a single unfired Cascade brand .22 magnum cartridge with a copper jacket and a hollow point was recovered from the murder scene. This cartridge was of the same type, design, and manufacture as those found in the appellant's weapon.

Upon listening to the testimony at trial, viewing the witness' demeanor, and considering the witness' testimony in light of all the facts in the case, the jury chose to accredit the state's witnesses. Assessing the credibility of witnesses is exclusively the purview of the jury. *State v. Banes,* 874 S.W.2d 73, 78 (Tenn.Crim.App.1993). That the jury accepted the veracity of the state's witnesses' testimony is not a basis for relief. We further find that Mrs. Robinson's testimony was sufficiently corroborated. Accordingly, reviewing the evidence in a light most favorable to the state, we conclude that the record amply supports the jury's verdicts.

## II

■ Appellant's second assignment of error is that the testimony of appellant's wife should not have been admitted. Appellant acknowledges that pursuant to *State v. Hurley,* 876 S.W.2d 57, 63–64 (Tenn.1993), the privilege to testify is vested in the witness spouse. The appellant, however, "urges adoption of the dissent in this case" reasoning "that the common law should not have been changed." We decline and follow our Supreme Court's decision by holding that the privilege of whether to testify was vested in Mrs. Robinson.

■ Appellant also alleges that because he had initially contacted the attorney representing his wife in this case, Mrs. Robinson should not have been allowed to testify. His argument is based on the premise that she "could have received privileged information through an attorney that he consulted about his case." In August of 1994, appellant raised this precise issue in an Extraordinary Motion. The trial court listened to arguments and found that "no confidential information was received,—that the client/attorney privilege had never been established, . . . "

■ Findings of fact by trial judges are afforded the weight of jury verdicts and are conclusive "if there is any evidence to support" them. *State v. O'Guinn,* 709 S.W.2d 561, 566 (Tenn.1986). We find that the record supports the trial judge's finding that the attorney had not received confidential information. Accordingly, the trial court did not abuse its discretion in admitting Mrs. Robinson's testimony.

## III

■ Appellant's third assignment of error is that the aggravating factors found by the jury for a sentence of life without parole are not supported by the evidence. The trial judge instructed the jury that a sentence of life without parole is predicated upon an unanimous finding of:

the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

1. that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

2. that the murder was committed while the defendant was engaged in committing or was an accomplice in the commission of,—or was attempting to commit, or was fleeing after committing or attempting to commit any first degree murder, robbery, burglary, theft or kidnapping.

The jury unanimously found that appellant killed Timothy Barnett "to eliminate him as a possible witness for assaulting and/or killing Janice A. Barnett." The jury held that his

acts met "the definition on statutory aggravating circumstances, No. 2." As to the killing of Janice Barnett, the jury found that after assaulting Janice and killing her husband, appellant "returned and further accosted Janice A. Barnett, to insure that she was in fact dead." The jury found that these acts also qualified "as statutory circumstance No. 2."

The substance of appellant's argument is that the jury was erroneous in finding aggravating factor number two applicable. He states that "[i]f anything, factor number one would be applicable but the jury did not so find."

We find no merit to appellant's argument. We look to the substance over the form. At trial, evidence was proffered that appellant killed Janice Barnett to prevent arrest or prosecution for felonious assault and kidnapping. The jury further heard testimony that appellant killed Timothy Barnett to prevent him from telling the police that he and Janice Barnett were together prior to her death. The record also indicates that appellant committed the murders while engaged in the crime of theft. While there is a danger of applying these circumstances too broadly in multiple murders, we find that the record clearly supports the jury's findings of aggravating circumstances in this case. *State v. Smith*, 868 S.W.2d 561 (Tenn.1993).

### IV

In appellant's fourth assignment of error, he asserts that the trial judge improperly restricted the jury instruction to Range I punishment on the lesser included offense. He argues that the jury should have been charged the complete range of punishment available, even when the state did not file a notice of enhanced punishment. Appellant cites *State v. Lawson*, 695 S.W.2d 202 (Tenn. Crim.App.1985), to support his proposition.

Appellant's issue is devoid of merit. The appellant could not have received an upper range sentence since a notice of enhanced punishment was not filed. The trial judge, therefore, correctly stated that appellant would receive a sentence of 15 to 25 years if found guilty of second degree mur-

der, the lesser included offense. We hold that by limiting instructions to the range which could actually be imposed, juries are apprised of the actual punitive consequences of their guilty verdicts. We cannot fathom how instructing the jury as to the sentence range which could actually be imposed would cause prejudice. *See State v. Watrous*, No. 01–C–01–9009–CC–00234, 1991 WL 23745 (Tenn.Crim.App. Feb. 26, 1991) (holding instruction only to Range I punishment, which actually applied to defendant, was not harmful). The legislature has apparently desired for juries to issue punishments suited to the jurors' sense of justice for a case. *State v. Adams*, No. 03C01–9403–CR–00123, 1995 WL 10340 (Tenn.Crim.App. Jan. 11, 1995). Charging inapplicable punishments undermines this policy. Accordingly, this issue is overruled.

### V

Appellant's fifth assignment of error is the admission into evidence of crime scene photographs depicting the victims. The defendant cites *State v. Banks*, 564 S.W.2d 947 (Tenn.1978). In *Banks*, the Court held that evidence, although relevant, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 951 (quoting Fed.R.Evid., Rule 403). Unfair prejudice is defined as "an undue tendency to suggest decision on an improper basis." *Id.* (quoting Fed.R.Evid., explanatory note to Rule 403).

We find the trial judge admitted the photographs to corroborate Mrs. Robinson's testimony of appellant's detailed description of the murders. The photographs illustrate that the position and location of the victims' bodies, as well as the nature of the wounds inflicted, were consistent with what appellant had told his wife. We also find that the judge, out of the presence of the jury, examined each photograph while listening to the arguments of counsel. The court admitted several photographs and excluded others as repetitious or unnecessary.

*Banks* recognizes the "policy of liberality in the admission of evidence in both civil and criminal cases, including the admission of photographs." The trial court weighs the

probative value against prejudicial effect. We cannot substitute our judgment for that of the trial court or declare error absent a finding that the trial judge abused his discretion. *State v. Melson,* 638 S.W.2d 342 (Tenn. 1982). Moreover, the evidence of appellant's guilt is overwhelming. Accordingly, we find that there was no abuse of discretion in admitting the photographs.

## VI

■ Appellant's sixth issue challenges the two year sentence he received on his conviction for arson. Appellant contends that he should have received the minimum sentence. Upon conducting a *de novo* review with the presumption that the trial court's findings were correct, we find no merit to appellant's claim. Tenn.Code Ann. § 40–35–401(d) (1990); *State v. Byrd,* 861 S.W.2d 377, 379 (Tenn.Crim.App.1993). The appellant had a prior felony, multiple misdemeanors, and was on community corrections at the time of the offenses. Furthermore, the record supports a finding that appellant was the leader in an offense involving two criminal actors. Accordingly, the evidence does not preponderate against the presumption that the trial judge correctly sentenced appellant.

## VII

■ Upon reviewing appellant's last assignment of error, "that running two counts of life without parole is excessive," we find it is without merit. Appellant argues that running life without parole sentences consecutively is illogical. In support of his contention he asks whether "a person can be declared legally dead, then be brought back to life to serve the second sentence of life without parole." We answer by stating that appellant is not entitled to a "free murder."

The power of a trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments. Otherwise defendants would escape the full impact of punishment for one of their offenses. *Frost v. State,* 336 Md. 125, 647 A.2d 106, 115 (1994). We hold that appellant should not escape the impact of consecutive sentencing merely because his crime was determined so heinous as to merit life without parole.

## CONCLUSION

The trial court approved the jury verdicts in this case. Because we conclude that appellant's assignments of error are without merit, the judgment and sentence of the trial court are, in all respects,

## AFFIRMED.

JONES and BARKER, JJ., concur.