# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## Assigned on Briefs July 21, 2009

## STATE OF TENNESSEE v. TRACY THOMAS HEPBURN

### Direct Appeal from the Criminal Court for Wilson County
### Nos. 02-0844, 02-0875, 02-0876, 02-0888, 02-0291    John D. Wooten, Jr., Judge

_____

### No. M2008-01979-CCA-R3-CD - Filed July 23, 2010

_____

Following a jury trial, Defendant, Tracy Thomas Hepburn, was convicted of twenty-four counts of burglary, a Class D felony, three counts of attempted burglary, a Class E felony, fourteen counts of misdemeanor vandalism, six counts of vandalism, a Class E felony, two counts of vandalism, a Class D felony, ten counts of misdemeanor theft, one count of theft, a Class E felony, and two counts of theft, a Class D felony, in case nos. 02-0844, 02-0875, 02-0876, 02-0888, and 02-0291. The trial court sentenced Defendant as a Range III, persistent offender, to ten years for each Class D felony conviction, five years for each Class E felony conviction, and eleven months, twenty-nine days for each Class A misdemeanor conviction. The trial court imposed a combination of concurrent and consecutive sentencing for an effective sentence of one hundred years. On appeal, Defendant argues that the trial court erred in denying his motion to suppress and in imposing consecutive sentencing. After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Adam W. Parrish, Lebanon, Tennessee, for the appellant, Tracy Thomas Hepburn.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Bobby Hibbett, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## I. Background

At trial, the State presented the testimony of twenty-one business owners or employees who testified about the burglaries, thefts and acts of vandalism committed in their respective establishments between June 19, 2002, and July 23, 2002. Each witness testified as to the value of property taken, if any, the value of the property vandalized, and how the perpetrator entered the business. Some businesses were victimized twice during this time frame.

One witness, Mayford C. Tipton, was able to identify Defendant as the person who burglarized Scott's Performance Cycle on July 13, 2002. Mr. Tipton entered the establishment as Defendant was leaving with the cash register. Mr. Tipton was armed with a 44 Magnum. He ordered Defendant to lay down on the floor and then called 911. Officer Erick Brockman, with the Lebanon Police Department, testified that he transported Defendant to the Wilson County jail following the burglary on July 13, 2002. Defendant went through the booking process and was then released on bond.

Officer Brockman testified that he ran into Defendant later at the Wilson County jail while Officer Brockman was attending to an unrelated matter. Officer Brockman asked Defendant, "What happened?" Officer Brockman said that Defendant responded that "he had gotten concrete poisoning and couldn't work anymore, and basically, that's when he started burglarizing all the businesses." Officer Brockman stated that Defendant also said "that he was just going to lie down in jail and serve out his time, and also that being in jail was going to be better than living off the streets."

Officer Robert Bates, with the Lebanon Police Department, testified that the officers were instructed on July 20, 2002, to closely monitor the businesses in the area because of the number of recent burglaries. Officer Bates said that during his shift that night, several burglaries occurred on Carthage Highway and one occurred on Tennessee Boulevard. Officer Bates responded to the dispatcher's call concerning a burglary at Stroud's Building Supply Company. After he completed the call, Officer Bates parked his patrol car in front of Quick Cash Pawn on East Main Street "waiting for the next one."

Officer Bates said that Defendant walked up to his patrol car and asked Officer Bates if there was a taxi cab in the area. Officer Bates recognized Defendant, and Defendant confirmed his identity. Officer Bates said, "[Defendant], if you don't mind standing here, I believe my bosses need to talk to you." Officer Bates stated that Defendant had a black substance on his hands. Other officers arrived at the scene. During a routine pat down, the officers discovered a large amount of change in Defendant's pockets.

Detective Sharron Costley with the Lebanon Police Department attempted to interview Defendant after he arrived at the jail, but Defendant refused to talk to her. Detective Costley asked Detective Lieutenant Gwen King, with the Mt. Juliet Police Department, to conduct Defendant's interview because Defendant knew him. Detective King read Defendant his *Miranda* rights, and Defendant executed a written waiver of his rights. Detective King said that Defendant told him that he could "not live on the outside." Defendant said that he had burglarized several business in the area, but he could not remember all of the names of the companies that were broken into. Defendant agreed to accompany Detective King the following morning so that Defendant could point out the locations of the burglaries.

On July 22, 2002, Detective Dayton Jamison with the Wilson County Sheriff's Department and Detective James Whited with the Lebanon Police Department joined Detective King and Defendant. Defendant was read his *Miranda* rights again and again executed a written waiver of his rights. Detective King said that Defendant was "happy," and told the detectives that "he was going to make Christmas for [them]." Detective King stated that he had a list of the locations of the recent burglaries, but he did not disclose this to Defendant. They began the drive in the eastern part of the county, and Defendant pointed out approximately twenty-seven businesses which he had burglarized. Defendant also told the detectives the location of a cash drawer he had taken from Stroud's Building and Supply Company, and Detective King said that the cash drawer was later recovered from that location.

Defendant signed the following written statement:

> I, [Defendant], give this statement of my own free will and accord. I am willing to cooperate with detectives from [the] Wilson County Sheriff's Dept. (Dayton Jamison), Mt. Juliet Police Dept. ([Gwen] King), Lebanon Police Dept., James Whited, and Rutherford County Sheriff's Dept. in helping them solve several business burglaries and vending machines which I am responsible for. I willingly after being advised of my rights and a waiver of my rights did agree to ride around with Detectives Jamison, King, and Whited and tell them and point out all the places I broke into in Wilson County, Mt. Juliet, Lebanon city limits and Rutherford County. These burglaries were committed on various dates and times, most of which were done after midnight.

> I spent most of the cash money I took on drugs, expensive foods, alcohol, expensive motel rooms, cigarettes, night clubs, renting limousines, and pretty much whatever I wanted. I broke windows out on many of the businesses, and then kicked or pried open a door to gain entry. Once inside I

pretty much tore the places apart while looking for cash. I did break into some vending machines during this time period also. A list of the businesses burglarized is written below and on the next page of this statement.

Detective King said that during the drive, Defendant stated that a cut on his hand was very painful. Detective King stopped to talk to Sheriff Terry Ashe who assured Defendant he would receive medical attention for his injury. However, Defendant asked Detective King if he could speak with his girlfriend before returning to the jail. Detective King drove Defendant to the Plaza Motor Lodge, Defendant conversed for a few minutes with his girlfriend, and then Detective King drove back to the Wilson County Jail.

The State rested, and Defendant presented his defense. Lieutenant Jason Gray testified that he was in charge of the records for the Wilson County Jail. Lieutenant Gray stated that Defendant went through the booking process at the jail on July 20, 2002. A note was written on Defendant's paperwork stating that Defendant had "hurt [his] right hand prior to book in." Lieutenant Gray said that according to the jail's records, Defendant filled out a request for medical care on July 22, 2002. A note on the request form signed by Dr. Brian Leery stated, "needs to be admitted to hospital." Lieutenant Gray said that in July 2002, the jail did not have a full time in-house nurse practitioner.

Detective Costley testified that she photographed Defendant's hands on July 20, 2002, after Defendant was taken into custody. Detective Costley acknowledged that another suspect was developed during the course of the investigation.

Detective Jamison testified that Defendant mentioned at some point during the drive on July 22, 2002, that his hand was hurting because of an injury. Detective Jamison, however, described Defendant as "pretty much jolly" during the drive. Detective Jamison stated that he prepared Defendant's written statement while they were driving. Detective Jamison acknowledged that his case notes indicated that another suspect was developed, but he said that to the best of his recollection the individual could not be located. On cross-examination, Detective Jamison said approximately $2,014 was recovered from Defendant when he was taken into custody, and that the money was eventually returned to Mid-South Drilling Company.

Dr. Paul Arthur Abbey testified that he saw Defendant after he was admitted to the hospital on July 22, 2002, and determined that Defendant had an abscess on his ring finger which required surgical intervention. Dr. Abbey said that a wound may become infected in three to ten days. Dr. Abbey acknowledged that Defendant described his pain as "throbbing/burning" and that he was given Percocet when he was admitted to the hospital. Defendant was later prescribed morphine.

At the conclusion of the trial, the jury convicted Defendant of the following offenses:

Case no. 02-0844    one count of burglary (a Class D felony)

one count of vandalism of property of less than $500 (a Class A misdemeanor)

one count of theft of less than $500 (a Class A misdemeanor)

Case no. 02-0888    six counts of burglary

two counts of theft of between $1,000 and $10,000 (a Class D felony)

four counts of theft of less than $500

one count of vandalism of property between $500 and $1,000 (a Class E felony)

one count of vandalism of property between $1,000 and $10,000 (a Class D felony)

three counts of vandalism of property valued under $500

Case no.02-0921    one count of burglary

Case no. 02-0876    one count of attempted burglary (a Class E felony)

two counts of burglary

one count of theft of property of less than $500

two counts of vandalism of property of less than $500

one count of vandalism of property of between $1,000 and $10,000

Case no. 02-0875    two counts of attempted burglary

fourteen counts of burglary

eight counts of vandalism of property of less than $500

five counts of vandalism of property of between $500 and $1,000

four counts of theft of property of less than $500

one count of theft of property between $500 and $1,000

## II. Suppression of Statement

Defendant filed a pre-trial motion to suppress his statement in which he contended that his statement was involuntarily given. Defendant alleged that the investigating officers told him that medical treatment would be withheld until Defendant agreed to sign a statement admitting to the commission of a number of burglaries. At the motion hearing, Detective Lieutenant Ricky Knight with the Wilson County Sheriff's Department testified that he and Detective Costley interviewed Defendant after he was taken into custody on July 20, 2002. Detective Costley read Defendant his *Miranda* rights, and Defendant signed a waiver of his rights. Detective Knight said that Defendant denied any involvement in the burglaries. Defendant told the detectives that he was in a bar that night, and "he guessed" that the man who was with him had committed the burglaries.

Detective Knight stated that Defendant did not appear to be under the influence of drugs or alcohol, and his responses to the questions were appropriate. Detective Knight said that Defendant became agitated because he felt that the detectives did not believe him. Defendant said that he wanted to talk to Detective King, and Detective Knight stopped the interview. Detective Knight said that he did not notice any injury to Defendant's hand. He stated that Defendant did not ask to speak to an attorney at any point during the interview.

On cross-examination, Detective Knight acknowledged that Detective Costley photographed Defendant's hands. On redirect examination, Detective Knight said that the photograph was not taken to document any injury. Detective Knight explained that one of the burglaries involved some carbon paper, and the black substance on Defendant's hands appeared to be carbon.

Detective King testified that he interviewed Defendant on July 20, 2002, at Detective Costley's request. Detective King read Defendant his *Miranda* rights again, and Defendant executed a written waiver. The two men conversed for a few minutes, and then Defendant orally admitted that he had recently committed several burglaries in the area. Defendant said that he could not name all of the businesses, and he agreed to show Detective King the location of all of the businesses on the following Monday, July 22, 2002. Detective King said that he knew Defendant, and Defendant acted the same way as he had in the past. Defendant told Detective King during the interview that he had hurt his hand, but that a

doctor had examined the cut at the county jail. Detective King said that on July 22, 2002, Defendant was "kind of laughing about [the drive] and said I'm going to make this Christmas for you."

On cross-examination, Detective King reiterated that Defendant mentioned during their meeting on July 20, 2002, that he had seen a doctor about the injury to his hand. Detective King acknowledged that Defendant's hand appeared swollen on July 22, 2002, and that Defendant complained of pain. Detective King said that Sheriff Ashe told Defendant that Defendant would receive medical treatment for his hand. Detective King stated that Defendant's hand did not appear to be hurting while Defendant talked with his girlfriend at the end of the drive.

Detective Jamison testified that he and Detectives King and Whited rode with Defendant in a patrol car on July 22, 2002, while Defendant pointed out the location of the businesses Defendant said he had burglarized. Detective Jamison stated that he had known Defendant for many years, and explained that Defendant had worked as an informant for him and Detective King when they were assigned to the Judicial Task Force. Detective Jamison stated that Defendant appeared the same on July 22, 2002, as he had in the past. Detective Jamison said that he noticed a bandage on one of Defendant's hands. During the ride, Defendant said that his hand was hurting, and that the doctor at the county jail was treating his injury. Detective Jamison said that Defendant did not mention his injury again until the drive was nearly over, and the detectives told Defendant that he would receive medical treatment.

Detective Jamison said that he wrote Defendant's statement and compiled a list of the burglarized businesses as the men were riding in the patrol car. Detective Jamison said that the group stopped on one occasion so that Defendant could purchase cigarettes. On another occasion, the detectives bought Defendant a cold drink and something to eat. At the end of the drive, the detectives stopped to speak with Sheriff Ashe about getting medical treatment for Defendant's injured hand. However, at Defendant's request, the detectives first drove to the Plaza Motor Lodge where Defendant's girlfriend was staying before returning to the jail so that Defendant could receive medical assistance.

The State completed the presentation of its proof, and Defendant called Sergeant Jason Gray with the Wilson County Sheriff's Department. Sergeant Gray testified that according to the intake form, Defendant arrived at the Wilson County Sheriff's Department at 6:58 a.m. on July 20, 2002. Sergeant Gray stated that Defendant's hand injury was noted on his medical questionnaire during the booking process. Sergeant Gray stated that the jail's records indicated that Defendant requested medical assistance at 2:30 p.m. on July 22, 2002.

A notation on the medical request form stating "inmate needs to see Dr. Abbey ASAP" was crossed out, and a second note stated "needs to be admitted to hospital."

Defendant testified that during his interview with Detective Knight and Detective Costley, he repeatedly denied that he had committed any burglaries. Defendant said that when the detectives accused him of lying, Defendant told them that he wanted to speak to an attorney, and the interview was concluded. Defendant stated that he told Detective King that he needed to see a doctor during the interview on July 20, 2002. Defendant stated, "I told him at that time that I want[ed] a lawyer and [Detective King] told me that if I would help him with the burglaries, that he would get [medical treatment] arranged for me."

Defendant said that his hand was swollen because a cut had become infected. Defendant stated that when Detective King picked him up at the jail on July 22, 2002, Defendant thought he was going to go to the hospital. Defendant said that he did not sign his statement until approximately 5:00 p.m. on July 22, 2002. After he signed his statement, one of the jail personnel filled out his medical request form and Defendant was seen by a doctor between 6:00 p.m. and 6:30 p.m. Defendant was then taken to the emergency room where he was given pain medication and prepped for surgery. Defendant said that he stayed in the hospital for seven days following his surgery.

On cross-examination, Defendant said that his hand was hurting before he was taken into custody but that the pain had intensified by July 22, 2002. Defendant acknowledged that he did not seek medical treatment before he was arrested. Defendant explained that he asked the detectives to drive him to see his girlfriend because his lease expired on July 26, 2002, and he wanted his girlfriend to take his personal belongings with her when she left. Defendant acknowledged that Sheriff Ashe told him that he would receive medical treatment before he signed his written statement, but Defendant insisted that he believed that he had no choice but to sign the statement.

At the end of the hearing, the trial court found the testimony of Detectives King, Jamison and Knight credible and found that Defendant had voluntarily and knowingly given his statement. The trial court found that although Defendant had suffered an injury and was experiencing pain, these factors did not affect his decision to voluntarily give a statement.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith,*

978 S.W.2d 861, 864 (Tenn.1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.* However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo. State v. Walton,* 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher,* 989 S .W.2d 295, 299 (Tenn. 1999); *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. *Colorado v. Connelly,* 479 U.S. 157, 163-64, 107 S. Ct. 515, 520 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump,* 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, ... any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Smith,* 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States,* 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897)). The totality of the circumstances must be considered in order to determine whether a confession is voluntary. *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996).

Detective Jamison and Detective King testified that they had known Defendant for a number of years, and Defendant did not appear any differently during his interview on July 20, 2002, or during the drive on July 22, 2002, than he had on other occasions. Defendant was read his *Miranda* rights before his interview with Detective Knight, before his interview with Detective King, and before the drive. On each occasion, Defendant signed a written waiver of his rights.

On July 20, 2002, Defendant told Detective King that he had committed several burglaries over the past few weeks, but he could not remember all of the names of the businesses. Defendant agreed to point out the businesses which he had burglarized. During the drive, Detectives Jamison and King said that they noticed Defendant's injury, and that Defendant complained of pain. They stopped so that Defendant could purchase cigarettes, and then stopped again to buy him food and a soft drink. At the end of the drive, the detectives stopped and told Sheriff Ashe that Defendant needed medical assistance, and

-9-

Sheriff Ashe agreed. After speaking with Sheriff Ashe, however, Defendant asked the detectives to drive to the motel where his girlfriend was staying instead of to the jail. Defendant said that he needed to arrange for his girlfriend to take possession of his personal property. According to Defendant's testimony at the hearing, he signed his written statement after Sheriff Ashe assured him that his injury would be examined by a physician.

Based upon our review, we conclude that the record does not preponderate against the trial court's findings that Defendant's written statement was not a product of coercion, and that Defendant knowingly and voluntarily signed the written statement. Defendant is not entitled to relief on this issue.

## III. Imposition of Consecutive Sentences

Defendant does not challenge the length of his sentences on appeal. However, Defendant argues that his effective sentence of one hundred years is not justly deserved in relation to the seriousness of the offenses, and far exceeds the sentence deserved based on the seriousness of the offenses committed. Defendant also contends that his effective sentence is disproportionate to sentences received by similarly situated offenders.

At the sentencing hearing, Matt Williams, a probation officer with the Tennessee Department of Probation and Parole, testified that he prepared Defendant's presentence report which was introduced as an exhibit without objection. According to the presentence report, Defendant was forty-five years old at the time of the sentencing hearing. Defendant reported dropping out of high school in the eleventh grade, but he obtained his GED in 1993. The presentence report reflects that Defendant is divorced with one adult daughter. Defendant did not provide any health or family information during the preparation of the report. Defendant noted, however, that he successfully completed treatment programs at Pathfinders in 1997 and the Samaritan Center in 1987. Defendant reported working for Cooper Electric Company for approximately three months in 1991, for I.B.E.W. for approximately four months in 1993, and for Reliable Builders for approximately three months in 2001.

Mr. Williams testified that Defendant was convicted of aggravated burglary, a Class C felony, in 1992 and was sentenced to three years. In 1993, Defendant was convicted of two counts of burglary other than a habitation, a Class D felony, and was sentenced to three years for each offense. Defendant was convicted of burglary of a building other than a habitation in 1998 and was sentenced to four years. In 1999, Defendant was again convicted of burglary of a building other than a habitation and was sentenced to four years. The trial court ordered Defendant to serve this sentence consecutively to his sentence for the 1998 burglary conviction. In addition to the burglary convictions, Defendant has two

misdemeanor assault convictions. The presentence report also notes that Defendant was convicted of possession of cocaine in Panama City, Florida, in 1995, but does not indicate the sentence imposed for this conviction. Mr. Williams stated that Defendant was on parole for his 1999 burglary conviction when he committed the offenses which are the subject of this appeal.

The trial court found that Defendant was a Range III, persistent offender, for sentencing purposes. *See* T.C.A. § 40-35-107. The trial court sentenced Defendant to ten years for each Class D felony, five years for each Class E felony, and 11 months, twenty-nine days for each misdemeanor conviction. The trial court ordered Defendant to make restitution in the amount of $42,082.73.

In determining the manner of service of Defendant's sentences, the trial court found that Defendant "is an offender whose record of criminal activity is extensive." *See id*. § 40-35-115(b)(2). The trial court also found that Defendant was on parole when he committed the current offenses. Based on these findings, the trial court ordered Defendant's sentences for the following burglary convictions to be served consecutively: count 1 in case no. 02-0844; counts 2, 3, 5, 11, 12, 13, and 16 in case no. 02-0875; and counts 2 and 3 in case no. 02-0888. The trial court ordered Defendant to serve his remaining sentences concurrently with each other and the burglary sentences listed above, for an effective sentence of one hundred years.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter,* 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby,* 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo*. *Carter*, 254 S.W.3d at 345 (quoting *State v. Shelton,* 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce,* 138 S.W.3d 820, 827 (Tenn. 2004)). In this case, we determine that the trial court relied on an improper factor in determining that consecutive sentencing was appropriate and thus our review is *de novo* without a presumption of correctness.

In conducting a *de novo* review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. These criteria include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on **probation**; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (emphasis added).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. T.C.A. § 40-35-102(1); § 40-35-103(2). Additionally, whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *State v. Hastings,* 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

One of the criteria considered by the trial court was Defendant's release status of parole when he committed the charged offenses. However, a trial court may only order the sentences to run consecutively pursuant to Tennessee Code Annotated section 40-35-115 upon a finding that the defendant was on **probation** at the time of the offenses. *See* T.C.A. § 40-35-115(b)(6). The term "probation" is not synonymous with the term "parole" for purposes of Tennessee Code Annotated section 40-35-115. *See State v. Charles Hall*, No. W2005-01338-CCA-R3-CD, 2006 WL 2334850, at *11 (Tenn. Crim. App., at Jackson, Aug. 11, 2006), *perm. to appeal denied* (Dec. 18, 2006) (citing *State v. Robert Sanford Barnes,* No. W2003-02967-CCA-R3-CD, 2005 WL 331376, at *13 (Tenn. Crim. App., at Jackson, Feb. 11, 2005), *no perm. to appeal filed*). Because parole status is not addressed in Tennessee Code Annotated section 40-35-115(b), this is not a statutory basis for ordering consecutive sentences. *See State v. Charles Edward Claybrooks, Jr.*, No. M2007-02685-CCA-R3-CD, 2009 WL 1643440, at *5 (Tenn. Crim. App., at Nashville, June 12, 2009), *perm. to appeal denied* (Tenn. Oct. 19, 2009). (We note, however, that by law Defendant's felony sentences must all be served consecutively to any remaining sentence for which he was on parole when he committed the current crimes. Tenn. R. Crim. P. 32(3)(A)). Nonetheless, we find ample justification to support the imposition of consecutive sentencing in these cases.

The record supports the trial court's finding that Defendant's record of criminal activity is extensive. T.C.A. § 40-35-115(b)(2). Defendant has two misdemeanor assault convictions in addition to the five burglary convictions which support his classification as a Range III, persistent offender for sentencing purposes. Also, current offenses may be used in determining whether a defendant's record of criminal activity is extensive for the purposes of consecutive sentencing. *See State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992); *State v. Carolyn J. Nobles*, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App., at Nashville, Mar. 7, 2007), *no perm. to appeal filed*; *State v. Bobby Blair*, No. M2002-02376-CCA-R3-CD, 2003 WL 22888924, at *3 (Tenn. Crim. App., at Nashville, Dec. 5, 2003), *perm. to appeal denied* (Tenn. May 17, 2004) ("[T]his court has held that [T.C.A. § 40-35]-115(b)(2) applies to both the extensive nature of the defendant's present convictions and the defendant's history of criminal activity.") (citing *State v. Palmer,* 10 S.W.3d 638, 648-49 (Tenn. Crim. App. 1999)).

In the case *sub judice*, Defendant was convicted of sixty-two counts of burglary, attempted burglary, vandalism and theft offenses committed against approximately twenty-six businesses, some of which Defendant victimized more than once, over a period of approximately five weeks. *See State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) (upholding the imposition of consecutive sentencing for a defendant who was convicted of eight crimes in a single trial based on the fact that the defendant's record of criminal activity was extensive even though he had no prior criminal convictions); *State v. Alex Dewayne Welles*, No. W2003-02282-CCA-R3-CD, 2004 WL 1606976, at *2 (Tenn. Crim. App., at Jackson, July 16, 2004), *no perm. to appeal filed* (upholding consecutive sentencing for a defendant convicted of forty-eight crimes occurring within a ten-month period, involving at least twenty-eight victims, some of whom the defendant victimized on more than one occasion).

Based on our review, we conclude that the record amply supports the trial court's finding that defendant has an extensive record of criminal activity.

Notwithstanding the propriety of consecutive sentencing, Defendant argues that his effective sentence of one hundred years far exceeds the sentence deserved for what Defendant submits are "relatively minor non-violent offenses" committed within a short period of time. Defendant also contends without citation to authority that his effective sentence is "inconsistent and unequal with sentences imposed against similarly situated offenders."

"The power of a trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments." *State v. Robinson*, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1995). Consecutive sentencing's ultimate goal is the protection of the public from a person who is "unwilling to lead a productive life" and will "resort to [future] criminal activity in furtherance of [his or her] anti-societal lifestyle." *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976). In furtherance of this goal, an effective sentence is not necessarily erroneous because it exceeds the anticipated life span of the defendant. *See State v. Arnett*, 49 S.W.3d 250, 264-265 (Tenn. 2001) (concluding that the record supported the trial court's order that the defendant serve his sentences for his especially aggravated kidnapping and aggravated rape convictions consecutively for an effective sentence of fifty years); *Robinson*, 930 S.W.2d at 85 (affirming two consecutive sentences of life without the possibility of parole, noting that the defendant was not entitled to a "free murder"). Nonetheless, the effective sentence must be based upon general sentencing principles.

In this instance, Defendant has clearly demonstrated that neither leniency nor incarceration has any deterrent effect on his decision to engage in criminal activities in

furtherance of his desired life style. In addition to three earlier burglary convictions, Defendant was convicted of burglary in 1999 while he was on release status for his 1998 burglary conviction, and he entered into the criminal spree leading to his arrest for the most recent offenses while he was on parole for the 1999 conviction. Between June 19, 2002, and July 13, 2002, Defendant committed seventeen burglaries on seven separate days. After he was arrested and released on bond for the July 13 burglary, Defendant continued his criminal activities, committing seven more burglaries on three separate days before he was apprehended again. Indeed, Defendant had committed four burglaries just before he approached Officer Bates on July 20, 2002.

Although the Sentencing Act was passed to "[a]ssure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentences," different sentences may be imposed "where they relate to differences in the offender or in culpability." T.C.A. § 40-35-102(2). *State v. Clint Ray McCoy*, No. W2002-01017-CCA-R3-CD, 2003 WL 21339285, at *3 (Tenn. Crim. App., at Jackson, May 23, 2003), *no perm. to appeal filed* (citing *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). "The policy expressed [in the Sentencing Act] is that the punishment imposed should fit the crime as well as the offender." *Moss*, 727 S.W.2d at 235.

The trial court imposed consecutive sentencing for one burglary committed on each of the ten days which comprised Defendant's criminal spree. Based on our review, we conclude that Defendant's effective sentence of one hundred years is reasonably related to the severity of the offenses and is necessary to protect the public from further criminal acts by Defendant. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-15-