IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

**STATE OF TENNESSEE v. DAVID RICHARDSON**

**Appeal from the Criminal Court for Shelby County**
**Nos. 11-02623, 11-07432     Lee V. Coffee, Judge**

**No. W2016-00174-CCA-R3-CD  -  Filed January 27, 2017**

The defendant, David Richardson, appeals the trial court's imposition of consecutive sentences upon remand for a new sentencing hearing.  After review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the appellant, David Richardson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Theresa McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

As the result of the defendant's and two co-defendants' engaging in a prolonged assault of gunfire on a crowd of people outside a Memphis home, the defendant was convicted by a Shelby County Criminal Court jury of first degree premeditated murder; twelve counts of attempted first degree murder, Class A felonies; twelve counts of aggravated assault, Class C felonies; one count of employment of a firearm during the attempt to commit a dangerous felony, a Class C felony; and one count of reckless endangerment committed with a deadly weapon, a Class E felony.  State v. David Richardson, No. W2013-01763-CCA-R3-CD, 2014 WL 6491066, at *1 (Tenn. Crim. App. Nov. 20, 2014).  The trial court sentenced the defendant to life imprisonment for the first degree murder conviction, eighteen years at thirty percent release eligibility for each

of the attempted first degree murder convictions, five years at thirty percent release eligibility for each of the aggravated assault convictions, six years at one hundred percent release eligibility for the employment of a firearm during the attempt to commit a dangerous felony conviction, and two years at thirty percent release eligibility for the felony reckless endangerment conviction. Id. The court ordered the sentences for the attempted first degree murder convictions be served consecutively to one another, consecutively to the sentence of life imprisonment, and consecutively to the sentences for employment of a firearm and felony reckless endangerment but concurrently with the sentences for the aggravated assault convictions, for an effective sentence of life imprisonment plus 224 years. Id.

On direct appeal, this court affirmed the defendant's twenty-seven convictions. Id. However, this court remanded the case to the trial court for a new sentencing hearing, limited to consideration of the factors outlined in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), to determine the propriety of consecutive sentencing. Id.

Because the facts of the case are important for us to conduct a thorough review of the trial court's decision on resentencing, we recite a summary of the facts from this court's opinion in the original direct appeal:

> Willie Brooks-Howze testified that at 10:30 or 10:45 p.m. on July 3, 2010, she dropped off her twenty-four-year-old daughter, Kimberly Jamerson, at the home of her sister, Sonja Watkins, which was located at 2706 Northmeade Avenue in Memphis. She said this was the last time she saw her daughter alive because her daughter was shot and killed later that night.
>
> Robrecus Braxton testified that he lived at 2706 Northmeade Avenue, Memphis, Tennessee, in Shelby County, with his mother, Sonja Watkins; his step-father, Felix Williams; his brother, Christopher Braxton; and his two sisters, Amber and Dakarrionah Laury. Robrecus said that on July 3, 2010, his family was preparing for a Fourth of July party at their house the next day. His cousins, Chymia Baker, Jalon Baker, Bianca Nevels, Travis Britton, Rodney Davenport, Terriance Webb; and his uncle, Nakia Greer, were also present during the party preparations on July 3, 2010.
>
> In the afternoon of July 3, 2010, Robrecus observed a green Chevrolet Lumina park in front of his home and saw [the defendant] and a man later identified as Kenneth Brown, get out of the car. He knew [the defendant] and Kenneth because they lived nearby and because he had gone to high school with them. Robrecus overheard an argument between

Kenneth and his uncle, Nakia Greer, wherein Kenneth claimed that Robrecus's aunt, Dena Watkins, had taken some of his marijuana. During the argument, Felix Williams, told Kenneth and [the defendant] that Dena Watkins was no longer present at the party. Williams told them to return later, and he would "get the situation handled." Kenneth and [the defendant] left but drove back to the area a few minutes later with a third man, later identified as Devon Brown. All three men exited the car, and Williams gave them $5.00 to settle Watkins's debt. The three men got back in the Chevrolet Lumina, and as they were leaving the area, their car nearly hit Robrecus, who reacted by throwing a beer can he had been holding into the open window of the car. The Lumina quickly stopped on Ladue Street, and the three men jumped out of the vehicle and began exchanging words with Robrecus. A fistfight eventually broke out with Kenneth Brown, Devon Brown, and [the defendant] fighting with Robrecus Braxton, Christopher Braxton, and Kenneth Baker. Robrecus stated that neither side had any weapons during the fight and that Williams broke up the fight. As [the defendant], Kenneth, and Devon were leaving, one of them said, "All right. That's what's up."

Approximately two hours later, Robrecus heard what he thought were fireworks and saw green and red lights before realizing that the sounds he was hearing were gunshots. He and his friend Lamarcus Moore ran under the carport toward the backyard. When he got to the backyard, Robrecus stood by a wall trying to take cover as the gunshots continued. He could see down the pathway and observed Mark and Steve Chambers standing on Northmeade Avenue returning fire with their own guns. He said Mark and Steve Chambers were the only two people at the party returning fire. Then Robrecus heard Moore say, "I'm hit, I'm hit hard." When the gunshots stopped, he heard Rodney Davenport yell, "Kim['s] been hit." Robrecus ran to the front yard and saw his cousin, Kimberly Jamerson, lying on the sidewalk in front of his house. His friends, Antoine Moore and Rico Chandler, put Robrecus in a car to get help. They found an unmarked police car a short time later and alerted the officer that Kimberly Jamerson had been shot and killed. Robrecus said that at the time the shooting occurred, the following people were in attendance at the party: Antoine Moore; Rico Chandler; Steve Chambers; Mark Chambers; Travis Britton; Kenneth Baker; Jalon Baker; Terriance Webb; Nakia Greer; his mother, Sonja Watkins; his two sisters; his cousin Whitney Henderson; and Lashanna Jones; as well as Jones's children, Shakarla King, Danaria Love, and Danara Love. He said that when he first heard the gunshots, some of

the people at the party were inside the house and some were outside under the carport.

Robrecus stated that the gunfire went on for "about ten minutes . . . like it wasn't going to stop." He could tell that the shooters were up the street because of the way the bullets were hitting the cars parked around the Northmeade house. However, he could not see the shooters because it was dark outside. Robrecus said that he was "terrified" and "felt like [his] life was in danger" because the "bullets could have hit anybody." The day after the shooting, Robrecus talked to police about what had happened and identified [the defendant] in a photographic lineup as one of the men involved in the fistfight prior to the shooting.

Felix Williams testified that when he arrived home on July 3, 2010, everyone was preparing for the Fourth of July party. He said that in addition to his wife and children, the following individuals were present at the party: Dena Watkins, Veronique Watkins, Kenneth Baker, Chymia Baker, and Jalon Baker. Williams said that he was standing outside his house with his kids, his kids' friends, and several nieces and nephews. He heard Dena Watkins ask Nakia Greer where she could purchase some marijuana, and Nakia Greer stopped Kenneth Brown, who was driving down the street, and asked Kenneth if he had any marijuana for sale. At the time, [the defendant] was riding in the front passenger seat of Kenneth's car. Williams said he knew [the defendant] because he lived on Ladue Street, which was nearby. Kenneth got out of his car and approached Dena Watkins. They walked around the side of a van, and approximately five minutes later, they reappeared, and Kenneth got back inside his car, with [the defendant] still in the front passenger seat, and drove around the corner. A short time later, Kenneth and [the defendant] returned to the party, and Kenneth stopped his car, got out, and asked Nakia Greer if Dena Watkins was around. When Greer told Kenneth that Watkins had just driven past him, Kenneth informed Greer that Watkins had stolen "like a gram of the marijuana[.]" Williams stopped the argument between Kenneth and Greer by telling Kenneth to return later when Watkins was back from the store. When Watkins returned to the party, she told Williams that she had not taken Kenneth's marijuana and then left the party again. When Kenneth Brown, Devon Brown, and [the defendant] drove back to the Northmeade house ten to fifteen minutes later, all three of the men got out of the car. Kenneth again asked for Watkins, and when Greer told him that she was not there, Kenneth demanded that Greer pay for the marijuana that Watkins had taken. Williams gave Kenneth $5.00 to settle the dispute and

told Kenneth, Devon, and [the defendant] to "[r]oll because we ain't going to need this around here."

Kenneth, Devon, and [the defendant] got back into the car. As Kenneth drove away, he nearly pinned Robrecus Braxton between his car and a parked car, and Robrecus reacted by throwing a beer ca[n] into Kenneth's car. Kenneth immediately stopped his car on Ladue Street. All three men jumped out of the Lumina, and Kenneth began exchanging words with Robrecus. Robrecus and Kenneth began fistfighting, and when [the defendant] and Devon tried to jump on Robrecus, Christopher Braxton and Kenneth Baker joined the fight, although neither side displayed any weapons. Williams said he and Greer attempted unsuccessfully to break up the fight. As Williams walked away, he heard glass break when someone threw something at the back window of Kenneth's car. He then heard Kenneth, Devon, or [the defendant] say, "We'll be back," before getting into Kenneth's car and driving up Ladue Street. After the fight, Williams, Robrecus Braxton, Christopher Braxton, and the other people involved in the fight returned to the house at 2706 Northmeade Avenue.

Williams said that his niece Kimberly Jamerson got to the party around 9:30 or 10:00 p.m. on July 3, 2010. Sometime between 11:00 p .m. and midnight, Williams walked Jamerson down the driveway to the car driving her home. When he turned and began walking up the driveway, he noticed that someone was shooting bottle rockets at his home. One of the bottle rockets hit his shoulder, and one hit a truck directly in front of him. Around ten seconds later, he heard gunshots, and everyone began "running and screaming for their li[ves]." Williams said he could tell that the shots were coming from a house on the hill across the street from his home but he could not see who was firing the shots. During the shooting, the majority of Williams's nieces and nephews were able to get inside the house. Williams said he "panicked" because the shots sounded like they "were getting closer and closer." He ran to the backyard where he saw Lemarcus Moore, who had been shot in the leg. As the shooting continued, Williams helped Moore into the house, where everyone was "hollering and crying." Williams said that his wife had taken the kids back to the bedroom, where she made them lie down on the floor. Williams said that the shooting seemed to go on "for a long time," and he felt like he was "in a war zone." He said he was "[s]cared for [his] life, scared for [his] family" during the shooting. When the gunshots finally stopped, things at his home were "[c]haotic" because "[p]eople were running around . . . trying to make sure everybody was fine." He said his house and van had bullet holes in them,

and his son's car, his wife's truck, and his neighbor's house all had been hit by bullets. Once the shooting finally ended, Williams saw Kimberly Jamerson lying on the sidewalk, and he "knew it didn't look good" because he saw "[n]o body movement."

Williams said that they put Lemarcus Moore, who had been shot in the leg, into a car and took him to the hospital. Later, Williams's friend told him that the boys who had fired the gunshots were Kenneth and Devon Brown. Williams said he "fell to his knees" because Kenneth and Devon Brown's father had been the mechanic who trained him, and he remembered Kenneth and Devon when they were little kids. Williams later gave a statement to police about the incident and identified [the defendant] from a photographic lineup as the person who sat in the front passenger seat of Kenneth Brown's car and as the person who was involved in the fistfight with Robrecus. He also identified Kenneth Brown from a second photographic lineup as the person who "killed [his] niece" and was "the driver."

Mark Chambers testified that he arrived at the party at 2706 Northmeade Avenue just as it was starting to get dark. He drove his nephew, Lemarcus Moore, and another person to the party in his burgundy Buick Roadmaster. Mark stated that he was sitting under the carport eating when he first heard the gunshots. Several people ran by him yelling, "They shooting, they shooting." Mark saw sparks as the bullets hit the bricks on the home. He ran to the backyard with everyone until someone told him that Lemarcus Moore had been shot. He looked for Moore in the front yard, and when he saw sparks from the bullets hitting the side of the house, he returned fire with his own guns, a 9 millimeter Smith and Wesson and a 9 millimeter Ruger, for which he carried a permit. Mark did not remember how many times he fired his guns but asserted that he was still being fired upon at the time he fired at them. He explained that he had his guns with him that night because he carried them with him wherever he went. He said he was "scared" when the gunshots started and that he could not see who was firing from the top of the hill because it was dark. He finally saw Moore when he "circled around the house . . . and came back up under the car[port]." Mark and Cleotha Norwood picked up Moore, who was bleeding, and put him in his car as the shooting continued, and his brother Steve Chambers drove them to the hospital. Mark said that nearly everyone else at the party had run into the house by the time they carried Moore to the car. He recalled that the shooting went on for "fifteen, twenty minutes."

-6-

Mark said he was not at the party when the fistfight between Robrecus Braxton and Kenneth Brown, Devon Brown, and [the defendant] occurred.

Steve Chambers, who was friends with Robrecus Braxton and Christopher Braxton, arrived at the party at the Northmeade house around 6:00 or 7:00 p.m. on July 3, 2010. He recalled seeing his brother, Mark Chambers, at the party as well as Lamarcus Moore, Robrecus Braxton, Christopher Braxton, and Felix Williams. Just before midnight, Steve was standing under the carport of the Northmeade house with several other people when he heard shots fired. When the bullets began hitting the cars in front of them, everyone "ran to the backyard." Steve could not see who was shooting but could tell that the gunshots were coming from a house across the street that was on a hill. He heard someone say that Kimberly Jamerson had been shot, and he walked back to the carport as Moore came out of the side door to the house and "just fell face first." When he saw that Moore's entire pant leg was "full of blood[,]" he realized that Moore also had been shot. At that point, Steve, Mark, and Cleotha Norwood grabbed Moore and ran to the car as the shooting continued. On the way, Steve picked up a gun that Mark had dropped and fired about three times in the direction of the shooters so that they could make it to the car. Steve said that he heard over fifty gunshots, that the shooting lasted "[a] good five, ten minutes," and that he was afraid. He said he never saw who was firing the shots because it was dark at the time. Steve said he was not present during the fistfight earlier that day.

Lamarcus Moore testified that he attended the party at the Northmeade house with his uncles, Mark and Steve Chambers. He heard people talking about a fistfight that had occurred before they got to the party. When a car drove by, he heard someone say, "That's them, that's them[.]" Later, Moore was standing on the street behind a truck when he saw some fireworks aimed at the house and then saw "bullets flying" toward the house from the same direction. He could not tell who was firing the gunshots because it was dark outside. When Moore realized that he had been shot, he ran toward the backyard and then went inside the house. He began to feel dizzy, and when he saw that he was bleeding, he fainted near the door. When he regained consciousness, Mark and Steve Chambers said they were going to drive him to the hospital, and Cleotha Norwood carried him to the car as the shooting continued. Moore said that he was "really terrified" when he realized that gunshots were being fired in his direction. Because he was shot in the main artery of his left leg, he underwent two surgeries which caused permanent scars, and the bullet remained in his leg.

Sonja Watkins, Felix Williams's wife and Robrecus Braxton's and Christopher Braxton's mother, testified that she was preparing food the afternoon of July 3, 2010 for the Fourth of July party the next day. In addition to her immediate family being present on July 3, 2010, she recalled that Nakia Greer, Steve Chambers, Mark Chambers, Bianca Nevels, Cleotha Norwood, DeAngelo Stallion, Travis Britton, Chymia Baker, Jalon Baker, Kenneth Baker, Davis Brooks, Whitney Henderson, Danera Love, and Danaria Love were also present. When Watkins heard about the fistfight in the front yard, she went outside to help break up the fight. Several hours later, she heard what she initially thought were fireworks but quickly realized were gunshots. She ran to the bedroom to get the children to a safe place and saw that "one of the boys" had been shot in the leg. She later went outside and saw her niece, Kimberly Jamerson, dying from a gunshot wound. Sonja said that the shooting "seemed like it went on forever" and when it finally stopped, she saw bullet holes throughout the living room of her home, causing drywall dust and shattered glass from the broken windows to be scattered around the room. She also said that there were bullet holes in the cars parked around the house and that bullets had "knocked bricks off the walls [of her home]."

Inga Yancy testified that she lived in the house at 3840 Helmwood Street, which was located at the corner of Helmwood Street and Northmeade Avenue. Between midnight and 12:30 a.m. on July 4, 2010, Yancey said she was awakened by what she thought were fireworks. She checked on her dog at the side door and went back to bed. A short time later, the police knocked on her door and informed her that there had been a shooting. Yancey stated that it took her approximately two minutes to get up, check on her dog, and return to her bed and that the noises that she thought were fireworks continued during the entirety of that time period. However, she admitted that she did not know how long the noises had been occurring before she was awakened. When the police arrived at her house, Yancy looked outside and saw a large amount of crime scene tape in her front yard.

Demar Wells, a crime scene investigator with the Memphis Police Department, testified that he investigated the two crime scenes in this case. He photographed and collected evidence from 3840 Helmwood Street and at 2706 Northmeade Avenue, where Kimberly Jamerson was killed. Investigator Wells found "a large amount of spent [shell] casings" in the front yard of the house at 3840 Helmwood Street and in the area

-8-

surrounding the house. He collected numerous spent shell casings from the 3840 Helmwood Street address, including thirty-two .30 carbine casings, eight .45 caliber casings, twenty-five LC-05 casings, and three .20 gauge shot gun shell casings. Investigator Wells and Sergeant Marlon Wright walked down to 2706 Northmeade Avenue and saw several cars with "possible bullet holes in them." He also saw what appeared to be blood at 2706 Northmeade Avenue where Kimberly Jamerson's body had been lying and what appeared to be blood inside the home at 2706 Northmeade Avenue. He observed damage to the Northmeade home from bullets. In addition, Investigator Wells found the following spent casings in the front yard at 2706 Northmeade Avenue: six 7.62 X 39 casings in the grass just east of where Jamerson's body was lying and nine 9 millimeter casings near the east side of 2706 Northmeade Avenue at the driveway. He stated that the 7.62 X 39 casings were shots from AK-47 or a MAC-90 automatic assault rifle and that the location of these casings meant that someone at the Northmeade location was shooting an automatic assault rifle. He also collected a bullet fragment under a Dodge Durango that was parked in the driveway and another bullet fragment on a window ledge inside the home. Investigator Wells noted that in his ten years with the crime scene investigation unit, this was the largest crime scene involving gunshots that he had ever investigated. Based on the evidence he had seen, he concluded that the shots fired at 2706 Northmeade Avenue came from the east. He noted that the house at 3840 Helmwood Street was three or four houses east of the house at 2706 Northmeade Avenue.

Marlon Wright, a sergeant and a crime scene investigator with the Memphis Police Department, testified that he collected evidence from the two crime scenes at the Northmeade and Helmwood locations for ten to eleven hours because the crime scenes were so extensive. Sergeant Wright stated that the Mobile Command Unit was called because the crime scene was spread over such a wide area that the officers needed additional light to process the scene. At the 3840 Helmwood Street address, he found "numerous spent casings" in the flower bed, along the wall of the house, along the sidewalk, and in the grass. He said that the house at 3840 Helmwood Street was located on a hill above the house at 2706 Northmeade Avenue. When he stood at the house at 3840 Helmwood Street, he was able to "see everything down the hill" to the Northmeade house. However, visibility from the Northmeade house to the Helmwood house was "limited at best" because of the sharp incline. Sergeant Wright said he and the other officers took photographs of the spent casings, took measurements for the diagrams, and collected evidence from both crime

scenes. He prepared several diagrams showing where each of the shell casings were found at the Northmeade and Helmwood locations and where the Northmeade house and cars near the Northmeade house were struck by bullets. Specifically, he saw "four bullet holes in the actual house located at 2706 [Northmeade Avenue] as well as four bullet holes in a vehicle parked in the driveway at 2706 [Northmeade Avenue]." In addition, there was a bullet hole in the left taillight of a vehicle parked in the driveway. Based on Sergeant Wright's measurements, the distance from a tree in front of the Helmwood house to the location where Kimberly Jamerson's body was found was 233 feet and 10 inches while the distance from the tree at the Helmwood house to the driveway of 2706 Northmeade Avenue was 294 feet and 1 inch.

Kevin Lundy, a sergeant with the homicide bureau of the Memphis Police Department, testified that he initially responded to the Northmeade crime scene but left that location to recover a Smith and Wesson silver and black 9 millimeter handgun and a 9 millimeter Ruger handgun that were found inside a burgundy Buick Roadmaster belonging to Steve and Mark Chambers that had been towed to the Memphis Police Department's crime scene tunnel. He photographed and collected the Smith and Wesson pistol from under the front passenger seat of the Buick Roadmaster and the 9 millimeter Ruger pistol from the trunk of the vehicle.

William Merritt, a sergeant and case coordinator for the homicide bureau of the Memphis Police Department, testified that he investigated the case involving the death of Kimberly Jamerson. Sergeant Merritt stated that although the shell casings found at the Helmwood address were dusted for fingerprints, no fingerprints were found on any of the casings.

Sergeant Merritt interviewed [the defendant] on the afternoon of July 4, 2010. After advising [the defendant] of his Miranda rights through an Advice of Rights form, [the defendant] waived his right to remain silent and his right to have an attorney present before answering questions about the incident. [The defendant] told Sergeant Merritt that he had driven to 2706 Northmeade Avenue with another person, and there had been a dispute over the amount of marijuana. He said that when they returned to the Northmeade address, they got into a fistfight with some individuals at the party there. [The defendant] claimed that after the fight, he left the scene and went to a female friend's house, where he stayed for a while, and he asserted that he was not present at the time of the shooting. When Sergeant Merritt asked him for the name of this female friend, [the

defendant] changed his story and stated that although he was going to go to his friend's house, he went to his mother's house instead. When Sergeant Merritt informed [the defendant] that he would have to talk to his mother to verify that he was with her at the time of the shooting, [the defendant] finally acknowledged that he had played a role in the shooting incident. [The defendant] then admitted that he had been armed with a revolver and that he had fired six shots in the air.

Following this admission, Sergeant Merritt and a transcriptionist prepared a written statement, which [the defendant] read and signed after making some corrections. [The defendant's] statement said that after the fistfight, he went to Kenneth Brown's and Devon Brown's house on Cracklerose Drive. He said that Kenneth "was talking about they was going to go and do something and so when they got strapped up, we went around there and parked around the corner." He said Kenneth Brown drove him and Devon Brown in Kenneth's blue Chevrolet Lumina to the Helmwood location, which was on the corner on a hill just up the street from 2706 Northmeade Avenue. They "hopped out, walked to the corner, and started shooting." [The defendant] admitted that he was present when Kimberly Jamerson was shot. He also admitted that he was armed with a revolver and that he had fired his gun six times in the direction of the people at 2706 Northmeade Avenue, but he claimed he "was pointing [his gun] up above them." [The defendant] said Kenneth and Devon Brown were firing shots during the incident, although he did not know what weapons they were firing and did not know where they had gotten the weapons. After firing the gunshots, they ran back to the car, and Kenneth dropped [the defendant] off on Coral Street. He then walked around the corner to his home. [The defendant] said that he left his weapon in the Lumina after the shooting. He claimed that it was not his idea to shoot at the house on Northmeade but that he "just went along with it." [The defendant] asserted that he "didn't plan on hurting nobody" and "was just going to shoot up in the air."

Sergeant Merritt stated that no firearms were recovered from [the defendant], Kenneth Brown, or Devon Brown. He also said that no weapons were found at the Browns' house on Cracklerose or in the blue Chevrolet Lumina. Sergeant Merritt identified a photograph showing that Kenneth Brown had a black eye, an abrasion on his nose, an injury to his right knee, and a[] scrape on his right shoulder at the time of his interview, which was a short time after the incident. He said that Kenneth's Chevrolet Lumina was found at the home of someone related to the Browns and that

when it was recovered, the back window was broken, but no bullets were found inside the vehicle. Sergeant Merritt stated that [the defendant] was cooperative and remorseful at the time he gave his statement. He also said that [the defendant] did not have a black eye when he was interviewed.

Dr. James Lewis Caruso, an expert in the field of forensic pathology, testified that he performed the autopsy on Kimberly Jamerson. He stated that Jamerson suffered a gunshot wound to the head as well as abrasions to her forehead, the bridge of her nose, and the tip of her nose. She also had a laceration near her mouth. Dr. Caruso said that the bullet entered and exited her head, causing "significant injury to her brain[.]" He explained that the bullet entered the front of Jamerson's head and exited at the back right of her head with very little deviation up or down and that the entrance wound and the exit wound were both around one inch from the top of Jamerson's head. During the autopsy, Dr. Caruso recovered several bullet fragments and pieces of the bullet jacket from Jamerson's head, which he gave to police. Dr. Caruso opined that Jamerson's cause of death was a gunshot wound to the head and that the manner of death was homicide.

Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation, was declared an expert in the field of firearms identification. He testified that he examined and tested the ballistics evidence collected in this case. Agent Scott opined that the six 9 millimeter cartridge cases found in the front yard of the home at 2706 Northmeade Avenue were fired from the Smith and Wesson 9 millimeter semi-automatic pistol recovered from Mark Chambers's vehicle. He also opined that the three 9 millimeter cartridge cases found in the front yard of the home at 2706 Northmeade Avenue were fired from the Ruger 9 millimeter pistol recovered from that same vehicle. In addition, he determined that the six 7.62 X 39 millimeter rifle cartridge cases that were found at the Northmeade location had all been fired from the same rifle, either an AK-47 or Chinese SKS. After examining the whole .30 caliber bullet found at the Northmeade address, Agent Scott determined that the bullet fragments recovered from Kimberly Jamerson's head matched this .30 caliber bullet and were consistent with having been fired from the same weapon, a .30 carbine caliber rifle. He also concluded that a different whole bullet and a bullet fragment collected from the Northmeade location were from the .22 caliber class and were most consistent with being fired from a 223 Remington caliber firearm.

-12-

Agent Scott also examined the casings found at the Helmwood address and concluded the following: the three .20 gauge shot shell cases had been fired from the same .20 gauge shotgun, the eight .45 caliber automatic cartridge cases had been fired from the same .45 caliber automatic pistol, the twenty-five LC-05 or 223 Remington caliber cartridge cases had characteristics indicating that they had been fired from the same "military assault-type rifle," even though he could not conclusively match them with one another, and the thirty-two .30 carbine caliber cartridge cases had been fired from the same .30 carbine military-style rifle. In addition, Agent Scott stated that although there was no way to determine whether a fired bullet came from a cartridge case, the 223 bullet and bullet fragment that were collected from the Northmeade location were of the same type and design as would come from the cartridge cases collected from the Helmwood location. Additionally, he stated that the .30 caliber carbine cases found at the Helmwood location were the same type and caliber as the bullet fragments recovered from Kimberly Jamerson's brain and as the .30 carbine caliber bullet from the Northmeade location. He stated that he was not given any evidence having to do with a revolver, although cartridge cases have to be manually removed from a revolver and are not ejected. Agent Scott determined that four firearms had been fired from the Helmwood location, although he acknowledged that a person or persons could have been firing more than one firearm. He also noted that the .30 carbine rifle, the 223 Remington rifle, and the .20 gauge shotgun were "long-range firearms" and that while the .45 caliber automatic pistol would "certainly travel as far from the Helmwood location down to the Northmeade location, [it was] not as accurate . . . at . . . striking the target [from a long distance away]." Agent Scott acknowledged that Felix Williams tested positive for gunshot residue, which indicated that Williams "could have fired, handled, or [been] near a gun when it fired." He also stated that "any firearm that's mounted with a laser si[ght] could project a green or red light" and that these sights could be placed on any of the aforementioned rifles or the .45 automatic pistol, although he would not expect to see a laser sight on a .20 gauge shotgun.

Id. at *1-9.

As to sentencing, this court noted that, at the original sentencing hearing, the State entered the presentence investigation report into evidence, and the defendant made the following statement of allocution:

-13-

Well, I just wanted to say I truly am sorry for the pain that I caused y'all, and I thank you so much more [for] forgiving me. I know I did wrong, and I've got to be punished for it. So I mean I found God in my life, and I can take my responsibility. That's all I want to say.

Id. at *27.

On December 17, 2015, the trial court conducted the remanded sentencing hearing, at which the defendant testified. The defendant apologized and acknowledged that his actions were "foolish" and "without excuse." It weighed heavily on him that his actions cost someone her life because he "had the power to prevent that[.]" He stated that prior to the crimes in this case, his only criminal activity was criminal trespass, for which he received a warning in juvenile court, and possession of marijuana in high school, which resulted in his being transferred to another school. However, he earned his high school diploma. While in prison, he had only received one verbal warning for being on the phone after lockdown, but it occurred during his first month in prison before he knew the rules and thought he had permission to stay on the phone. He had participated in barber and carpentry classes in prison, as well as worked in the laundry area.

The defendant testified that he had given his life to God and was ministering to other inmates. He knew how foolishly he had acted and asked the court for mercy because he was "not that same foolish kid[.]" He was "getting great satisfaction" from ministering and preaching the gospel. A letter written to the defendant's mother by another inmate was admitted into evidence, stating that the defendant had ministered to him. The defendant said that he was not "trying to hide behind the Bible" and believed that whatever happened in court, he had the satisfaction of knowing that he was doing God's will. The defendant asserted that, if released from prison, he would never be involved in criminal activity again.

At the end of the hearing, the trial court made detailed findings, concluding that consecutive sentencing was appropriate and imposing the same sentence as originally imposed.

## ANALYSIS

In imposing consecutive sentences, the trial court, in findings spanning thirty pages, first noted that it considered the evidence from the trial and the original and remanded sentencing hearings, the allocution the defendant gave in the original hearing as well as his testimony at the remanded hearing, and the fact that the defendant would be in his seventies if the court imposed *concurrent* sentences. The court further noted that it considered the principles of sentencing, evidence of mitigating or enhancing factors, and

statistical data regarding sentencing practices for similar offenses – including that of the co-defendants. The court also considered the defendant's potential for rehabilitation and treatment, citing the defendant's expressions of faith, which the court "d[id] not doubt," and generally good behavior while in prison. The court also took into account that the defendant had a high school diploma and had been involved in programs in prison in an effort to rehabilitate himself.

The court then reviewed the facts of the case. The court recalled that the dispute started when the defendant and co-defendants got into an argument with the victims regarding five dollars' worth of marijuana. A fistfight ensued despite the fact that someone else paid the five-dollar debt in order to keep the peace. The defendant and co-defendants lost the fistfight but vowed to return. The defendant and co-defendants returned with assault rifles and other firearms and fired sixty-eight shots at the home where the twenty-five to thirty victims were gathered for a cookout. The victims dove for cover to save their lives during an event that several characterized as a "war zone."

Based on these facts, the court found that the defendant was a dangerous offender whose behavior "indicate[d] that he had little or no regard for human life, and he had absolutely no hesitation about committing a crime in which the risk to human life was high." The court specifically found that the offense was aggravated and surmised:

> I can't think of anything more gruesome, more violent, more horrifying, more shocking, or more reprehensible, or more exaggerated than what [the defendant] did on the night that he fired these shots at this house killing Kimberly Jamerson for no reason other than they were aggrieved that somebody had . . . allegedly taken five dollars ($5) of marijuana from [a co-defendant].

The trial judge noted that he had not seen facts "more troubling" than the crimes committed by the defendant in the thirty-three years he had been practicing law.

The court noted that it considered mitigating circumstances, such as the defendant's minimal criminal record, when it imposed the length of the defendant's sentence, which was less than that of his two co-defendants. However, the court characterized the defendant's crimes as a case of "domestic terrorism" in a residential neighborhood. The court found that consecutive sentences were "warranted because of the seriousness of this offense" and necessary to protect the public from further acts of violence by the defendant. Countering the fact that the defendant would be in his seventies if the trial court imposed *concurrent* sentences, the court pointed out that in State v. Robinson, 930 S.W.2d 78 (Tenn. Crim. App. 1995), this court held that a defendant sentenced to life imprisonment should not be able to avoid consecutive

sentencing simply because he is serving a life sentence. The court then imposed the same sentences as originally imposed.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including the one the trial court found applicable in this case – that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4).

When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); Wilkerson, 905 S.W.2d at 937-38. Our standard of review for a trial court's order of consecutive sentencing is abuse of discretion with a presumption of reasonableness. State v. Pollard, 432 S.W.3d 851, 859-60 (Tenn. 2013).

The defendant contends that the trial court "did not properly articulate and adequately find both Wilkerson factors" and that the trial court's "finding that said sentence was necessary to protect the public against further criminal conduct by this [d]efendant, whose criminal record is *de minimis* and who has consistently expressed remorse about his conduct and role in this crime, was erroneous and not supported by the proof[.]"

The defendant asserts that the trial court focused solely on the circumstances of the crimes and not on his future propensity to be dangerous. He compares his case to the facts in Wilkerson and State v. Imfeld, 70 S.W.3d 698 (Tenn. 2002), and reaches the proposition that a trial court can only justify a finding of danger to the community if the defendant's prior history supports it. However, Wilkerson and Imfeld are easily distinguishable from this case and the fact that the actions of the defendants in Wilkerson and Imfeld were the result of intoxication and not premeditated and knowing acts, like the defendant's here, actually works against the defendant. In this case, the defendant engaged in attempted mass murder *despite* his benign social history; therefore, his social history provides no assurances that he is not a risk to the public in the future.

Moreover, although the trial court did not use the precise terminology that "consecutive sentences reasonably relate to the severity of the offense committed," it is readily apparent from reading the trial court's findings that the court determined as such.

-16-

We conclude that the trial court's findings are supported by the record. The defendant simply disagrees with the court's conclusion.

In any event, even if there were error in finding the defendant to be a dangerous offender, the court could have appropriately imposed consecutive sentencing upon finding that the defendant had an extensive record of criminal activity given his present convictions. This court has held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)); see, e.g., State v. Kyle Ronald Fencl, No. M2012-01265-CCA-R3-CD, 2013 WL 3976060, at *8 (Tenn. Crim. App. Aug. 5, 2013), perm. app. denied (Tenn. Nov. 13, 2013). A trial court may impose consecutive sentencing after finding any one of the criteria in Tennessee Code Annotated section 40-35-115(b). The trial court did not abuse its discretion in imposing consecutive sentences in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE